(Decided 12th July, 1882.)

---

THOMAS  J.  KEATING,  and  B.  PALMER  KEATING, Trustees of CHARLES  J. B.  MITCHELL  *vs.*  WILLIAM J.  PRICE.

*Vendor and vendee—Sale of land set aside, because of Misdescriptions not obviously Injurious, but which materially induced the Purchaser to make the purchase.*

A purchaser is compellable to accept property, not strictly corresponding to that described in the sale, only when the variance is so immaterial that he is considered as getting substantially what he intended to buy, and what constituted the object and inducement of his purchase.

And while it is incumbent on the buyer to show that a misdescription, not obviously injurious, relates to a fact which materially induced him to make the purchase; when this is established, much weight should be given to the purchaser's own estimate of how far the deficiency or deviation, in the light of his own judgment and calculations, would affect the purposes he sought to accomplish in procuring the property.

APPEAL from the Circuit Court for Queen Anne's County, in Equity.

The case is stated in the opinion of the Court.

The cause was argued before BARTOL, C. J., STONE, MILLER, ALVEY and RITCHIE, J.

*B. Palmer Keating, and Thomas J. Keating,* for the appellants.

*John B. Brown,* and *Edward H. Brown,* for the appellee.

RITCHIE, J., delivered the opinion of the Court.

The question presented by this appeal is, whether the property for which it is sought to hold the appellee liable as purchaser, differs so materially from that contemplated by the parties in their negotiations, and described in the contract of sale, as to entitle the appellee to a rescission of the contract; or, whether the difference is so slight that the sale should be ratified, and the purchaser compensated by an abatement of the purchase money equivalent to the loss sustained.

The bargaining, which extended over only a day or two, was between C. J. B. Mitchell, the *cestui que trust,* and the appellee, and their agreement reduced to writing, was signed by themselves and the trustees of Mitchell, T. J. and B. P. Keating, Esqrs. Shortly afterwards a survey, as provided by the agreement, was made to ascertain the precise quantity of land, which was found to be about twenty acres.

The survey disclosed that a portion of the land, about one-fourth of an acre on the Queenstown road, and near the angle made by the road and Queenstown Creek, and which Mitchell had pointed out to the appellee as part of the property to be sold the latter, and which was then enclosed by Mitchell's fence and in his occupancy, belonged to the Chester River Steamboat Company as part of a lot

extending to the water front which Mitchell had deeded to them some years before. The survey further disclosed that there was less water front by a few feet to the land sold Price than Mitchell had designated. These misrepresentations on the part of Mitchell are not claimed to have been fraudulently made, but they were relied on by Price, and both Mitchell and his trustees supposed them to be correct, until reminded or apprised of their mistake by the survey.

It further appears that Mitchell stated to Price, as one of the inducements to buy, that he had merely made a lease to the Steamboat Company of the lot, which he had actually granted them, and that he had reserved certain rights and privileges in it as adjacent to the wharf, with a right of way over the same from Queenstown, which were appurtenant to the land offered to Price. In these statements he was mistaken; though proof was offered showing that one of the trustees had controverted these claims in the presence of Price at the time the agreement was signed, on his recollection of the deed the company had received from Mitchell; but the deed itself was not at hand nor exhibited.

Immediately upon the discovery of Mitchell's errors as to the boundaries, through the survey, Price declined to receive the property as not being what he had purchased. The trustees, however, reported the sale for ratification, the terms of the agreement also expressly providing it was made subject to the approval of the Court; but the sale having been rejected in accordance with the exceptions of the appellee, and a decree passed setting aside the contract, the trustees took the present appeal.

The law applicable to cases of sale where the property is not exactly identical with that described in the contract of purchase is well settled.

It is laid down in *Kent's Com.*, vol. 2, sec. 476: "The good sense and equity of the law on this subject is, that if

the defect of title, whether of lands or chattels, be so great as to render the thing sold unfit for the use intended, and not within the inducement to the purchase, the purchaser ought not to be held to the contract, but be left at liberty to rescind it altogether. This is the principle alluded to by Pothier and repeated by Lord ERSKINE and Lord KENYON." And, further on in the same section, the author says, "If there be a failure of title to part, and that part appears to be so essential to the residue that it cannot reasonably be supposed the purchase would have been made without it, as in the case of the loss of a mine, or of water necessary to a mill, or of a valuable fishery attached to a parcel of poor land, and by the loss of which the residue of the land was of little value, the contract may be dissolved *in toto.*"

The equitable rule as given by *Story* in his *Eq. Juris., vol.* 1, *secs.* 777 and 778, is, "If the circumstances of the quality or quantity of land are not correctly described, and the misdescription is not very material, and admits of complete compensation, Courts of equity will decree a specific performance. In all such cases Courts of equity look to the substance of the contract, and do not allow small matters of variance to interfere with the manifest intention of the parties, and especially when full compensation can be made to the party on account of any false or erroneous description.

"But where there is a substantial defect in the estate sold, either in the title itself, or in the representation or description, or the nature, character, situation, extent or quality of it, which is unknown to the vendee, and in regard to which he is not put upon inquiry, there a specific performance will not be decreed against him."

And so in the case of *Gunby vs. Sluter*, 44 *Md.*, 247, this Court, adopting the language of leading authorities, lays it down: "The vendor must be prepared and able to convey and transfer to the purchaser an estate or inter-

est substantially corresponding with that bargained for and agreed to be sold, both as regards the tenure and the situation and condition and natural advantages of the property. Any misdescription of the estate or interest, or extent or value of the property in a material and substantial point, so far affecting the subject-matter of the contract, that it may reasonably be supposed that but for such misdescription the contract would never have been made, at once releases the purchaser from the bargain." Of similar purport is the decision in *Foley vs. Crow*, 37 *Md.*, 60, where the rule is fully considered, and in the cases of *Ellicott vs. White*, 43 *Md.*, 135, and *Rayner vs. Wilson and Hunting*, 43 *Md.*, 440.

It is obvious from these citations, that a purchaser is compellable to accept property not strictly corresponding to that described in the sale, only when the variance is so immaterial that he is considered as getting substantially what he intended to buy and what constituted the object and inducement of his purchase. If Courts undertook to go beyond this, the right of parties to determine for themselves what they would buy and what they would sell, would be practically annulled. It would be in effect to impose contracts upon parties, at the discretion of Judges, into which they never entered. Bargains would be clouded with uncertainty, and much hardship would result.

While the rule is a salutary one, that sales solemnly made shall not be cancelled for trivial deficiencies or variations in the property sold, Courts are solicitous to give effect to the real purpose of the contracting parties, and will not sanction such misdescriptions as would defeat or essentially impair the very objects which impelled them to the transaction.

And while it is incumbent on the buyer to show that a misdescription, not obviously injurious, relates to a fact which materially induced him to make the purchase, when this is made apparent much weight should be given to

the purchaser's own estimate of how far the deficiency or deviation, in the light of his own judgment and calculations, would affect the purposes he sought to accomplish in procuring the property.

In the present case we have a plain and conceded misdescription of the property by Mitchell to Price, in respect of its boundaries and its relations to the steamboat company's wharf and the road from Queenstown. How material the deviation is, as bearing upon Price's motives in entering into the contract and affecting the substance of the transaction, is the next subject of inquiry.

In the first place, the proof shows that Price promptly made the cash payment of twenty-five hundred dollars so soon as the agreement was signed ; and as promptly repudiated the purchase when the survey disclosed the variation already referred to ; and in his exceptions to the ratification of the sale he makes the distinct averment that in the particulars wherein the property failed to correspond with Mitchell's representations there was a failure of valuable and material inducements moving him to the purchase, and but for which he would not have entered into the contract.

It is true, that in mere point of quantity and outline the variation is not great; but the significance of this variation is to be measured by the special adaptability of the part of which Price was deprived to the particular uses for which he had designed it and the primary consideration which induced him to enter upon the negotiation. The angle of land to which the change relates, lies upon navigable water adjacent to the steamboat wharf and depot lot, and on the road leading from Queenstown to the wharf. The proof shows that Price had in contemplation, and so informed Mitchell, the erection of a phosphate factory and a canning factory, to the business of which establishments ample water front, proximity to the wharf and depot, readiness of ingress and egress, facility of approach,

and compactness of situation, would be especially valuable advantages. For his particular purpose no other portion of the twenty acres was so peculiarly adapted; and an acre or an acre and a half of land was all that he really needed for his enterprise. Price first sought to buy only this quantity, at the locality indicated, expressly stating the uses for which he desired it. But Mitchell, being pressed for a greater amount of money than this proposed site would bring, and stating his urgency, declined to sell Price the part indicated unless he would include with it the balance of the contiguous land, comprising twenty acres. In order then to secure the particular parcel he desired, relatively much more valuable than the rest, and having been assured by Mitchell by actual designation that in getting the entire lot he would secure the precise locality intended for his factories, he consented to buy the whole twenty acres.

As before stated, the survey disclosed that about one-fourth of an acre on the Queenstown road was within the lines of the steamboat lot, there was less water front to a small extent, than had been represented, in the land next the creek, and the means of access to the property were much less favorable. Moreover, the privileges of the right of way from Queenstown, and in and over the depot lot, proved more circumscribed than Mitchell had stated them to be.

From the history of the negotiations we think the fairest and best test in determining the materiality of the variations is not by their relation to the entire parcel of twenty acres, as if its purchase had been Price's main design, but as they bear upon his real and avowed motive and object, the acquisition of the acre or acre and a half, pointed out near the junction of the road and the stream, for his contemplated factories. By this criterion the materiality of his loss becomes more apparent. Buying, as he did, the quantity of twenty acres for the express purpose

of securing a particular acre or acre and a half because of its peculiar fitness, by reason of its locality as described by Mitchell himself, for his special purpose, it would seem harsh and inequitable to hold him to the bargain, with a material change in the very part for the sake of getting which he burdened himself with the payment for so much more land than he really desired or needed.

Looking to the entire transaction, from its inception to the filing of his exceptions, we think the appellee is entitled to have the contract of sale rescinded; and, that accordingly the decree of the Circuit Court should be affirmed.

> *Decree affirmed, and*
> *cause remanded.*

(Decided 12th July, 1882.)