HARRY P. REIGART *v.* EDWARD McC. FISHER ET AL.

*Vendor and Purchaser—Specific Performance—Deficiency in Quantity—Abatement of Price—Time As Essence.*

Although time was of the essence of a contract for the sale of land, *held* that the vendors were entitled to notice from the purchaser that the latter would be on hand on the stipulated

date, ready to accept a deed, certain correspondence between the parties in regard to a shortage in the acreage having left the negotiations very much in the air. p. 345

Where there is a substantial defect with respect to the nature, character, situation, extent, or quality of the estate, which is unknown to the vendee and in regard to which he is not put upon inquiry, specific performance will not be decreed as against him. p. 346

When some part of the land contracted to be sold cannot be conveyed by the vendor, from some cause not involving *mala fides* on his part, and such part is of small importance, or is immaterial to the purchaser's enjoyment of that which may be conveyed to him, the vendor may insist on performance, with compensation to the purchaser, or a proportionate abatement from the agreed price. p. 346

Any misrepresentation or misdescription of the estate or interest or extent or value of the property in a material and substantial point, so far affecting the subject-matter of the contract that it may reasonably be supposed that, but for such misdescription or misrepresentation, the contract would never have been made, at once releases the purchaser. pp. 346, 347

In a suit by a vendor for specific performance of a contract for the sale of a country home, described in the contract as "containing seven acres more or less," and stated by the vendor, in answer to the purchaser's inquiry, to contain seven acres or more, *held* that, although the property was only four and three-quarters acres, the vendor was entitled to specific performance, with an abatement of the price on account of the deficiency in acreage. pp. 347, 348

It appearing that the vendor had been negotiating for certain neighboring property to take the place of the deficiency in acreage, *held* that the purchaser should be allowed an abatement equal to the price of that property. pp. 348, 349

*Decided December 10th, 1925.*

Appeal from the Circuit Court of Baltimore City (Solter, J.).

Bill by Edward McC. Fisher and Gulielma L. Fisher, his wife, against Harry P. Reigart. From a decree for plaintiffs, defendant appeals. Affirmed in part.

The cause was argued before BOND, C. J., PATTISON, URNER, ADKINS, OFFUTT, DIGGES, and PARKE, JJ.

*George Arnold Frick* and *William C. Devecmon,* with whom were *Frick, Devecmon & Whiting* on the brief, for the appellant.

*Vernon Cook,* for the appellees.

ADKINS, J., delivered the opinion of the Court.

This is a suit for specific performance of a contract between plaintiffs and defendant for the sale and purchase of a country home in the new annex to Baltimore City, "containing about 7 acres, more or less, and improved by a 15 room stucco cottage, a garage and other improvements. Being the same property conveyed by deed dated June 26, 1917, from Elizabeth D. Lee, widow, to the above mentioned parties of the first part (the vendors), and recorded among the Land Records of Baltimore County, in W. P. C. 484, folio 164." "The purchase price is thirty-five thousand dollars. ($35,000.00) of which five thousand dollars ($5,000.00) have been paid prior to the signing hereof and the balance is to be paid as follows: Six thousand ($6,000.00) dollars within 30 days from the date hereof, which is the date agreed upon for transfer of title. It is understood between the contracting parties that there is an existing mortgage or mortgages, amounting to fifteen thousand dollars ($15,000.00), held by Elizabeth D. Lee, widow, of which twelve thousand dollars ($12,000.00) bear interest at 5% per annum, and three thousand dollars ($3,000.00) at 6% per annum, and the seller agrees to arrange for extension of same for a period of 3 years from July 12, 1923, and it is also further understood and agreed between the contracting parties that there is another existing mortgage or mortgages, amounting to

nine thousand dollars ($9,000.00) held by D. K. E. Fisher and Dr. W. A. Fisher, bearing interest at 6% per annum, and the sellers agree to have this extended to July 12, 1924, at which time the buyer agrees to pay for same.  Possession is to be given on date of transfer."  "Time shall be the essence of this contract, and in the event said purchaser shall fail to pay the balance of said purchase money as agreed, the said sellers may at their option, declare this contract void, and all amounts paid prior to the time of such default shall be forfeited to them as liquidated damages for breach of this contract."

The contract is dated July 12th, 1923.  The name of Mrs. Fisher, the owner of the property, by her husband, was signed ("Gulielma P. S. Fisher per E. Mc. Fisher") and he also signed his own name.  The testimony in the case shows he had authority to act for her in the matter at the date of the contract, and his so doing was confirmed by a letter from Mrs. Fisher to the brokers dated July 15th, 1923.  The important questions in the case grow out of the acknowledged shortage of acreage, the true amount contained in the property being 4.764 acres, and the dispute as to representations made by Mr. Fisher and J. S. Fenwick, an employee of Caughy & Co. the brokers, as to the southern boundary of the property,—Reigart, the defendant, insisting that in pointing out the boundaries, Fenwick said "the southern boundary line is beyond the woods," and that Fisher acquiesced in this description by nodding his head.  This is denied by both Fisher and Fenwick.  As a matter of fact the woods are not a part of the property.

There is the further question whether the plaintiffs were able and willing to perform their part of the contract at the time fixed for the settlement.  The testimony of the respective parties is sharply conflicting as to the southern boundary line pointed out by Fenwick and Fisher prior to the execution of the contract.  The respective contentions of the parties are supported by two witnesses on each side, Fisher and Fenwick on the part of the plaintiffs and Mr. and Mrs.

Reigart on the part of the defendant. But when the cir-cumstances are taken into consideration, and the subsequent conduct of the parties, the weight of the testimony is with the plaintiffs. Fenwick's alleged statement and Fisher's ac-quiescence are so linked together by the Reigarts that they must stand or fall together. It is difficult to believe that Fisher could have been guilty of the folly of acquiescing in a representation, not only false but which must, in the nature of things, immediately become palpable, and which, accord-ing to defendants' testimony, was in fact uncovered within a day or two by the agent of plaintiffs. It may be urged that Fisher was ignorant of the true southern line, just as he was mistaken about the number of acres in his place. But one not accustomed to measure land by the eye might easily over-estimate acreage, forgetting the quantity men-tioned in his deed; whereas one who has owned a home con-taining a few acres of land for six years, and for a number of years previous to that rented and occupied it, would hard-ly get the idea that he owned a considerable tract of wood-land not included in his deed.

At this point we may as well dispose of the controversy as to what was said about the acreage before and at the time of the signing of the contract. Fisher stated in the prelim-inary negotiations that he thought there were seven acres in the tract, and we do not find plaintiffs' contention is sus-tained, that at the time of the preparation of the contract Fenwick called Reigart's attention to the fact that accord-ing to the deed to Fisher the tract contained only four and three-quarters acres.

The day after the signing of the contract Fenwick wrote Reigart the following letter, viz:

"Mr. H. P. Reigart,

"Monroe, N. Y.

"Dear Sir:

"Mr. Edward Fisher, vendor of the property at Melvale, Baltimore, Md., which you have contracted to buy, has informed us that after consultation with his attorney and brother-in-law at our request, he finds

that he has title to only the 4.764 acres contained in the deed which is referred to in the contract of sale.

"The outlines of the property are exactly those which we pointed out to you, but he was mistaken as to the correct acreage. This discrepancy does not change the property as you saw it, and we sincerely trust that it will not affect its value and attractiveness to you.

"We regret very much that this error was made and await your advice in the matter.

"Caughy & Company.

"Rec'd July 14.                    (Signed) J. S. Fenwick."

Reigart says he was considerably upset on receipt of this letter, and about July 20th returned to Baltimore to see Caughy & Company about it.

In the meantime, on July 17th, Fisher wired Reigart as follows: "Please wire at my expense latest date furniture must be out of house." And on July 18th Reigart replied by wire: "August fifteenth."

It will be noted that although he had then heard of the shortage in acreage, no point is made of it, but Fisher is notified to move by August 15th, and there is no suggestion that the matter be held up for further investigation. That telegram is practically a confirmation of the contract after Reigart was advised of the shortage.

On arriving in Baltimore, according to the testimony of Mr. and Mrs. Reigart, they went to the office of Caughy & Company and told Caughy they had come to see him with reference to Fenwick's letter in regard to the shortage. He said Fenwick had been handling the matter and he would not be back that afternoon, but would call at their hotel the next morning. "In the meantime, Mrs. Reigart told him some sort of an adjustment would have to be made. Mr. Caughy said, to use his exact language 'I do not disagree with you.' and he said further—Mrs. Reigart then said, 'Perhaps the matter might be adjusted by taking some of the Fishers' furniture.' He had not seen the furniture up to that time, because most of it was covered up when we entered the

house." Reigart further testified that he asked Caughy where the shortage was, and he replied "In the southern line, southern part." And that Caughy further said, "If we cannot adjust this matter in any other way, I will make Fisher buy some additional land to make good the deficiency. I own a tract of forty acres, and I will make him do it, we will fix it up some way"; that witness told Caughy he was going to put his garage in the woods, and Caughy said, "Fisher don't own that. I own that."

It is significant that at this point Reigart did not intimate that there had been any misrepresentation about the ownership of the woods. When asked, "Did you say then, 'I am going to call the whole thing off,' " his answer was, "No, I said, 'All right.' I wanted the property."

It will be noted that in this conversation Caughy did not profess to have any authority from Fisher to make a contract for him as to any additional land.

Continuing, Reigart testified that the next morning Fenwick called at the hotel and they talked about an adjustment, that Fenwick said Fisher was out of town, but he located him by telephone, and reported to Reigart that Fisher said he would have to consult his wife, who was in Vermont, before committing himself as to furniture to make up the deficiency in land, and "I told Mr. Fenwick that I had sent for my car to come over from New York to get us, and we were going to drive home, and that I could not wait for Fisher to come up from the Eastern Shore, that we were in a hurry to get started, but that I would go out and take another look at the furniture and have another look at the ground, that I was disturbed about the garage, and he did not go along."

Here again it will be noted that there apparently was no complaint to Fenwick that he had made any misrepresentation about the southern boundary line, although Reigart had been told the day before that Fisher did not own the woods; and Reigart was trying to negotiate for the furniture to take

the place of the shortage in acreage. At that time he was showing no particular interest in the woods, which he testified Caughy had promised to make Fisher buy for him if the matter could not be settled any other way. This attitude is not consistent with the testimony of Reigart and his wife that they would not have agreed to purchase this property except for the alleged representation that Fisher owned the woods, and that they discussed with Fenwick and Fisher the location of a garage in the woods as the only suitable place.

After returning to New York Reigart wrote Fenwick on July 23rd:

"Dear Mr. Fenwick:

"Have decided we do not want any of the furniture in Fisher's house—except porch furniture.

"Please arrange for the additional tract of land accordingly.

"Yours very truly,

"(Signed) Harry P. Reigart."

Reigart testified that it had been agreed that the porch furniture was included in the sale of the property. Fenwick testified that on receipt of the above letter he took the matter up with Mr. Caughy and requested him to get the title to two and a quarter acres adjoining. Caughy said he would look after it but informed Fenwick that the mortgagee of that property was in Europe. It appears in evidence that at the time of the trial Caughy was ill and could not be a witness.

On July 27th Fenwick replied to Reigart's letter of the 23rd as follows:

"Dear Sir:

"Your letter received relative to the Melvale property. I have informed Mr. Fisher of your decision in the matter and am making what arrangements I can for obtaining the additional tract. The mortgagee of that tract is now in Europe, so we may not be able to obtain a release until he returns. If it is not possible to get a clear title, will a cash adjustment of

$1,500 be satisfactory to you? If so, it will simplify matters a great deal.

"I would appreciate your advice.

"Very truly yours,

"(Signed) J. S. Fenwick."

To which letter Reigart replied by wire from Hagerstown on August 1st: "Will stop in Baltimore on way home few days." Nothing further was heard from Reigart until August 11th, the day on which by the terms of the contract of July 12th the property was to be conveyed.

On the morning of that day, shortly before noon, Senator Frick communicated with Fenwick or with Caughy; said Reigart was in town and, as testified by Senator Frick, asked if "they were ready to convey the property expected by Mr. Reigart, and whether the mortgages had been extended. He (Caughy) said that Mr. Fenwick would come around and see Mr. Reigart when Mr. Reigart came to my office and was ready to see him." According to Fenwick the appointment was made for about 1.30 or 2 o'clock, and he went to Senator Frick's office at that time, having endeavored unsuccessfully in the meantime to find Mr. Fisher. There were present Senator Frick, his stenographer, Reigart and Fenwick. There is some conflict in the testimony as to just what was said there.

Reigart on this occasion, for the first time so far as the record discloses, asserted that Fenwick had told him that the line on the southern boundary extended into the woods. According to Fenwick, he positively denied this, and according to Reigart he said "I do not see how I could have done anything like that." Senator Frick's recollection was that he did not deny it.

A deed for seven acres was demanded or a return of the $5,000 paid on account.

The mortgages on the property described in the contract had not then been actually extended. But Reigart testified he did not reject the property because the mortgages had not been extended.

Fenwick seems to have used the expression "you have the whip hand in this matter," and, according to Frick and Reigart, said the $5,000 which they demanded would be paid back, but Mr. Caughy was the only one to draw checks and it could not be delivered until Monday. Fenwick's account of the alleged statement by him is as follows: "Senator Frick then said, 'You can convey title only to the edge of the woods,' and I said, 'Yes, that is as far as we can convey the title.' Senator Frick turned to Mr. Reigart and said, 'Well, what about it?' or something to that effect. Mr. Reigart said, 'I don't want the property, I want my $5,000 back.' I said, 'Well, the banks are closed now. Your check has been deposited, and there is no one in the office that can draw a check except Mr. Caughy, so that I could not possibly return it to you today, but I will take the matter up with Mr. Caughy and send the check to Senator Frick as soon as possible, if Mr. Caughy and Mr. Fisher agree to it.' I also made the remark that if it were true that I had told him that the property ran into the woods, it looked as though he had the whip hand in the matter, but we would have to see what Mr. Fisher and Mr. Caughy would have to say about it."

But immediately after testifying to this, Fenwick reiterated his previous testimony that he did not tell Reigart that the line ran into the woods. There is no specific contradiction of the testimony of Fenwick as to the conditional character of his offer to return the check. Nor is there any evidence that he had authority to release Reigart from his contract. It is true that time was made of the essence of the contract. But there is abundant evidence that plaintiffs, on August 11th, were able and willing to perform their part of the contract of July 12th, 1923, and that they would have been ready to do so on any sort of fair notice that the defendant would be on hand at that time, ready to accept a deed. In view of the correspondence, especially Reigart's telegram of August 1st, by which the negotiations were left very much in the air, plaintiffs were entitled to such notice. They could at any time have conveyed the very property de-

scribed in the contract. It did not contain the number of acres mentioned in the contract, but it was the identical property by metes and bounds, and, by the weight of the testimony, the exact property pointed out to the defendant. As to the extension of the mortgages, all the mortgagees testified that they had agreed before August 11th to extend them and were ready to do so. It is not necessary, therefore, to decide whether defendant was estopped to insist upon an exact performance as to time because of his telegram of August 1st and his failure to meet the appointment indicated therein for completing the negotiations undertaken to satisfy him. But see *Stern v. Shapiro*, 138 Md. at p. 626. It is important, however, to consider the effect of Fisher's representation as to acreage.

It is undoubtedly the rule that a vendee in an unexecuted contract is entitled to have that for which he contracts before he can be compelled to part with the consideration he agreed to pay. Where there is a substantial defect with respect to the nature, character, situation, extent, or quality of the estate, which is unknown to the vendee, and in regard to which he is not put upon inquiry, specific performance will not be decreed. *Miller's Equity Proc.*, p. 802; *Buchanan v. Lorman*, 3 Gill, 51; *Foley v. Crow*, 37 Md. 51. But the variance must be substantial and material. When some part even within the bounds of the land contracted to be sold cannot be conveyed by the vendor, from some cause not involving *mala fides* on his part, if such part is of small importance, or is immaterial to the purchaser's enjoyment of that which may be conveyed to him, the vendor may insist on performance, with compensation to the purchaser, or a proportionate abatement from the agreed price. But this cannot be done where the part is a considerable portion of the entire subject matter, or is material to the enjoyment of the other part. *Miller's Equity Proc.*, p. 803; *Foley v. Crow, supra; Keating v. Price*, 58 Md. 532.

Any misrepresentation or misdescription of the estate or interest or extent or value of the property in a material and

substantial point, so far affecting the subject-matter of the
contract, that it may reasonably be supposed that but for
such misdescription or misrepresentation the contract would
never have been made, at once releases the purchaser from
the bargain. *Gunby v. Sluter,* 44 Md. 237; *Keating v.
Price,* 58 Md. 532.

Now the present case does not involve inability to convey
any part of the land described in the contract; but the land
described contains only four and three-quarters acres, where-
as it was represented in the written contract to contain
"about seven acres, more or less," and the husband of the
owner, acting for her, in response to an inquiry as to how
many acres there was in the property said, seven acres, or
more than seven acres. This was a personal representation
made in the course of the negotiations for the sale by the
husband of the owner, who had lived on the place a number
of years, and on whose judgment and knowledge the pur-
chaser had a right to rely. It is more than the mere recital
in a contract of acreage "more or less" following a descrip-
tion by definite boundaries. The general rule in such case
of misrepresentation, where the sale can be enforced, is that
the vendee shall have what the vendor can give, with an
abatement for so much as the quantity falls short of the rep-
resentation. *Marbury v. Stonestreet,* 1 Md. 147; *Kent et al.
v. Carcaud,* 17 Md. 291.

This brings us to the final question: Did the chancellor
err in decreeing specific performance or in the compensation
awarded?

Applying the rule approved in *Keating v. Price, Gunby v.
Sluter,* and *Foley v. Crow, supra,* and in *Doyle v. Whitridge,*
97 Md. 211, and *Slingluff v. Dugan,* 98 Md. 518, we think
that the contract was properly enforced. It is apparent from
the evidence that defendant was not especially concerned
about just how many acres he got. At any rate it certainly
cannot be said that the misrepresentation as to acreage so
far affected the attractiveness of the place that it could rea-

sonably be supposed that but for such misrepresentation the contract would not have been made; or that by reason of the shortage in acreage, which in value was less than six per cent. of the purchase price, defendant failed to get substantially what he intended to buy and what constituted the object and inducement of the purchase. He saw the place and was attracted by its appearance. He saw just what was contained within its boundaries. He desired it only for a home and not for a farm.

We have not overlooked the argument appealingly presented by counsel for appellant, based on changed conditions. But unfortunate and regrettable as they are, we cannot disregard the law as announced by Judge Miller in *Brewer v. Herbert,* 30 Md. 301, where enforcement of the contract involved peculiar hardship: "Where a contract respecting real estate is in writing, and is in its nature and circumstances unobjectionable, it is as much a matter of course for a court of equity to decree a specific performance of it, as it is for a court of law to give damages for a breach of it. The fairness or hardship of a contract, like all its other qualities, must be judged of at the time it was entered into, not by subsequent events. If it was then certain, mutual, fair in all its parts, and for an adequate consideration, it is immaterial that by "force of subsequent circumstances, it has become less beneficial to one party unless such change is in some way the fault of the party seeking its specific execution." See also *Cochran v. Pascault,* 54 Md. at p. 18.

This is not the kind of a case where the hardship of enforcement to the defendant is out of proportion to the benefit of the plaintiffs.

We find no error in the decree appealed from in so far as it granted the prayer for specific performance, and for injunction restraining the defendant from prosecuting his suit at law for the recovery of the payment on account of purchase money.

But there was error we think in the abatement allowed the defendant. The evidence shows that the price of the two

acres lot which plaintiffs were negotiating for to take the
place of the shortage was two thousand dollars, and that
amount should have been allowed in abatement.

> *Decree affirmed in part and reversed in part,*
> *and cause remanded in order that a decree*
> *may be passed in accordance with this*
> *opinion, with costs to appellant.*