## TOLCHESTER BEACH IMPROVEMENT COMPANY
### *v.* CHARLES P. BOYD et al.

[No. 8, October Term, 1931.]

*Decided November 5th, 1931.*

The cause was argued before BOND, C. J., PATTISON, URNER, ADKINS, OFFUTT, PARKE, and SLOAN, JJ.

*James W. Chapman, Jr.,* for the appellant.

*Edward A. Smith,* with whom was *Joshua Clayton* and *Cook & Markell* on the brief, for the appellees.

ADKINS, J., delivered the opinion of the Court.

This is an appeal from a decree dismissing the bill of complaint of the appellant for specific performance of a contract of purchase of wharf property on the Sassafras River at Fredericktown in Cecil County.

The history of the transaction, briefly, is as follows:

The appellees, Charles P. Boyd and H. M. Coale, residents of the State of Pennsylvania, were members of a yachting club called "Tockwogh Club," and desired to purchase for the uses of the members of said club suitable property on the Sassafras River.

Mr. Coale testified that he and a group of his friends were looking for a location; that he had anchored frequently in

the neighborhood of Fredericktown and Georgetown, and, during the course of time, had seen the Tolchester Company property; that he telephoned Mr. Hudson, president of the Tolchester Beach Improvement Company, and asked him if the property was for lease; that he said it was not, but they would sell it for $10,000; that witness asked him what approximate acreage was there; that he said, an acre and a half; that witness drove to Chestertown, one or two days later, and on the way stopped off and looked at the property and wrote to Mr. Hudson on February 4th, 1929, immediately following that trip, and requested him to send witness "a sketch or blue-print showing just how the one and a half acre property is bounded"; that witness also asked for an appointment some time during the week of February 11th to discuss the matter in person. The witness admitted he knew, before signing the contract, that there wasn't an acre and a half in the property.

On February 7th, Hudson replied, and inclosed "a rough sketch of our Fredericktown wharf property." In that letter he informed Coale that there were several parties "negotiating for the property and we think it a fair price we are asking for it, situated as it is close to the State Road." The "rough sketch" was a copy made by Hudson from a drawing that was furnished the company at the time it purchased the property. This sketch indicated a frontage of 183 feet on the county road leading from Cecilton to Georgetown, a depth, at about the centre, of 150 feet, and, at the end next to the state road bridge connecting Kent and Cecil Counties, a frontage of 50 feet. If the drawing had been to scale it would have indicated a frontage of about 50 feet at the southwesterly end next to the Standard Oil property. But it did not purport to be accurate, but only a "rough sketch." After the receipt of this sketch, Boyd and Coale called at Hudson's office. The date of this interview was February 11th. Boyd testified that on this occasion Hudson told him the property contained about an acre and a half, "and he said it ran, roughly speaking, 383 feet from the bridge along the road.

describing that you turn off to the right from the main road, and that was about all he told me about the property excepting there was sufficient water for a dock." "We told Mr. Hudson that we wanted the property for a yacht club and we would have to have a suitable—sufficient ground to build garages and enlarge the dock and any other buildings we might find necessary to put on."

On cross-examination, Boyd admitted that he knew the property they were buying from the Tolchester Company began at the bridge and came down toward the Standard Oil Company; that before the first interview with Hudson he and Coale went on the property, saw the wharf buildings and the Standard Oil Company property; that they saw the land and walked over it; that he had a survey made of it on March 4th, and then figured out the contents, and found it contained less than half an acre; that nothing was said about this to Hudson or the company, after finding it out, until April 11th; that in this period, between March 4th and April 11th, application was made by witness and his associates to the War Department for permission to erect piers and other improvements, to which was attached a plan for the docks.

In passing, it should be noted that these plans were made and sent for approval to the War Department after full knowledge by the applicants of the shortage due to the encroachment by the state road bridge on the property of the Tolchester Company. At the interview of February 11th, Boyd and Coale were told by Hudson that it would be necessary for them to act promptly if they wanted the property, as there were other parties interested in buying it. Notice of acceptance was promptly given by the appellee, and, in a day or two, a letter was sent with a check for $500 on account of purchase money, and there followed promptly a form of agreement prepared by counsel for appellees, in which the property was described: "All that certain lot or piece of ground with buildings and improvements thereon erected, situate on the south side of the Fredericktown-Maryland Road on the west side of the Sassafras River in Cecil Coun-

ty, Maryland, extending at right angles to the said Fredericktown-Maryland Road about three hundred and eighty-three (383) feet along a public highway at right angles to the said Fredericktown-Maryland Road and extending from said road to the low water mark of the Sassafras River together with the wharf of the said party of the first part and all riparian rights, a complete description to be made by a survey of the said property before settlement. * * *" On receipt of this form of agreement, Hudson had a different form prepared, in which the description of the property was by metes and bounds, and the distances were given in perches instead of feet, the description being the same as in the deed by which the Tolchester Company took title. This agreement was sent to Boyd by Hudson, with a letter stating that the writer thought it would be "better for you than the one that you sent me as it covers all the property that the company holds at Fredericktown, Md.," and giving reference to the title deed of the company. This agreement was executed by all the parties as of February 13th, 1929. In this agreement, the line along the Cecilton-Frederick Road was given as 22-8/10 perches. This, of course, is 376-2/10 feet, whereas the rough sketch furnished by Hudson indicated 383 feet; and "about 383 feet" was called for in the form of agreement tendered by the appellees.

On March 4th appellees had a survey made of the property. This survey showed only 352-3/10 feet, in said line, which is accounted for by the fact that, after the company acquired the property, the state road bridge encroached upon it. This encroachment varies from about 24 feet at the Cecilton Road to 40 feet at the shore line. In other respects, the survey agrees with the description in the agreement. After this, survey plans for piers were submitted by appellees to the War Department for approval.

On hearing of the proposed plans, some fishermen living at Fredericktown filed objections with the County Commissioners of Cecil County on the ground that the proposed piers would cut off access from the water to the shore on the com-

pany's property, where fishermen had been accustomed to landing, and the commissioners filed a protest with the War Department. On April 11th, two days before the expiration of the sixty days allowed in the agreement for the payment of the balance of the purchase money, Boyd, accompanied by a Mr. Collins, commodore of the yacht club, called at Hudson's office. Hudson called Mr. Chapman, the company's attorney, over the 'phone and requested him to come to the office.

There is some discrepancy between the testimony of Hudson and Chapman on the one side, and Boyd and Collins on the other, as to just what occurred at that interview. But we are satisfied from all the testimony of the following facts:

(1) That at that time plans had been made and blue-prints prepared by appellees and submitted to the War Department based on the measurements of the appellees' surveyor, which showed that there were only 352-3/10 feet along the Cecilton-Georgetown Road, and that the shore line was about forty feet less than as described in the agreement.

(2) That neither at that interview, nor at any time prior thereto, was there the slightest intimation by appellees of an intention to abandon the contract on account of any difference between the contents of the property as indicated by the "rough sketch" or described in the contract, and the contents shown by the survey, and that there was then no such intention.

(3) That, if at that time there was any serious question in the minds of appellees about the suitability of the property for their purposes, it was caused by the protest which had been made by the county commissioners.

(4) That, notwithstanding this protest, appellees gave every indication of their intention to take the property, and requested the president of the company to accept a mortgage for part of the purchase money, asking for a few days delay for the final settlement.

Undoubtedly the description of the 352-3/10 feet line was erroneously given in the agreement as 22-8/10 perches (376-2/10 feet), and, at the time of signing the agreement,

appellees did not know that about 24 feet of this line and about 40 feet of the shore line were occupied by the bridge. It is also true that the description in the agreement gives the distances in perches and not in feet. This circumstance is dwelt upon by appellees as misleading. But it is incredible that intelligent business men, such as appellees evidently are, were so misled. At any rate, they must be taken to have known what the agreement they signed clearly disclosed.

After the interview of April 11th, nothing was heard by appellant from appellees until the following letter of F. A. Moorshead of April 29th to the Tolchester Company was received:

"Gentlemen:

"Mr. Charles P. Boyd has referred to me for attention your letter of the 20th inst., in regard to the purchase of wharf property at Fredericktown, Maryland. Mr. Boyd and Mr. Coale entered into the agreement with your company for purchase of this property on representations made by your company as to the size of the property and the water front rights that you owned. Upon investigation, my clients found that unknown to you, forty feet of the property had been taken off for State Road purposes and there existed claims of right to use the beach for a public landing for the inhabitants of Fredericktown. These people employed counsel and objected to the construction of piers, etc. My clients are not buying a law suit and I have advised them that they are under no obligation to proceed with the purchase of this property and that your Company is not in a position to deliver what the agreement calls for and that they are entitled to the return of the down money. Will you please send a check for $500 to the order of Charles P. Boyd and H. M. Coale.

"Very truly yours,

"F. A. Moorshead."

This was the first intimation given the appellant of an intention by the appellees to abandon the contract, and it came

sixteen days after the time agreed upon for final settlement, and fifty-six days after appellees had full knowledge of the contents of the property. Hudson wrote Boyd on April 20th, and wired him on April 26th, demanding settlement. Almost immediately after signing the agreement appellees removed from the premises the "For Sale" sign which appellant had set up, and posted a notice that the "Tockwogh Club" had bought the property and would occupy the same. This notice remained on the property until after the attempt by appellees to repudiate the contract.

On or about April 17th, before there was any intimation of an intention to withdraw from their agreement, appellees entered into negotiations for the lease of another property in the neighborhood, which was soon thereafter acquired.

We have no doubt that plaintiff is entitled to the relief prayed. It is not seriously contended that the alleged representation before the contract was signed (which was denied and not clearly established), that the property contained about an acre and a half, is material in this case. If it were so contended a sufficient answer would be: (1) One of appellees admitted that it was apparent to him from a view of the property, before the contract was signed, that it contained no such acreage; (2) both of appellees were on the property and saw just what it was, and observed its well-defined boundaries; (3) it is apparent from the description in the contract that the parties could not have been misled in this respect. The real and only serious complaint could be: (1) As to the shortage in the property actually described in the contract; (2) as to the claim involved in the protest of the county commissioners.

When some part even within the bounds of the land contracted to be sold cannot be conveyed by the vendor, from some cause not involving *mala fides* on his part, if such part is of small importance, or is immaterial to the purchaser's enjoyment of that which may be conveyed to him, the vendor may insist on performance with compensation to the purchaser, or a proportionate abatement from the agreed price. But this cannot be done where the part is a considerable

portion of the entire subject-matter, or is material to the enjoyment of the other part. *Miller's Equity Proc.*, p. 803; *Foley v. Crow,* 37 Md. 51; *Keating v. Price,* 58 Md. 532; *Reigart v. Fisher,* 149 Md. 336, 131 A. 568. [The general rule in such case of misrepresentation, where the sale can be enforced, is that the vendee shall have what the vendor can give, with an abatement for so much as the quantity falls short of the representation.] *Marbury v. Stonestreet,* 1 Md. 147; *Kent v. Carcaud,* 17 Md. 291; *Reigart v. Fisher, supra.*

In *Reigart v. Fisher, supra,* the contract was enforced, although the shortage was about two acres out of a total of seven; whereas in *Keating v. Price, supra,* the court refused a decree for specific performance, although the shortage was only about a quarter of an acre in a total of twenty acres. These two cases well illustrate the proper application of the principle. In the former we found that the misrepresentation as to quantity did not so far affect the attractiveness of the place that it could reasonably be supposed that, but for such misrepresentation, the contract would not have been made; whereas in the latter the court found that the quarter of an acre, the title to which was not in the vendor, was a part of a small piece of land which was the inducing cause of the purchase of the whole, as shown not only by the purpose for which it was to be used, but also by the manifest good faith in which the purchase was immediately repudiated on the discovery that title could not be given. Measured by this test, it is obvious to us that the position of appellees in regard to the shortage caused by the encroachment of the bridge is untenable. Their whole conduct, as above narrated, negatives the idea that they regarded this shortage as material, or of so much importance that the contract would not have been made if they had known of this error in the description. They not only did not promptly suggest, on discovering the shortage, that it was material and ask to be released, but both of them testified that they would have taken the property except for the protest of the county commissioners. As late as the interview of April 11th, which was thirty-eight days

after the survey made at their instance revealed the discrepancy, their only concern was about said protest.

It remains to consider this protest and claim of landing privilege as affecting the ability of the appellant to give an unincumbered title.

The contention of appellees, as stated in their brief, is that a strip of land within the lines of the property described in the contract, for a distance of about sixty feet along the shore, "is public property, because (1) it is within the lines of the forty foot roadway purchased by the county for a road, or (2) even though some land might now exist between the forty foot roadway and the water, it was originally the bed of the river and is land made by the county."

The evidence offered by appellees fails to sustain the contention that the road as laid down extends to the edge of the water, or that the land between the road and the water was originally the bed of the river. But even if that had been proved, it would be immaterial. The road was acquired by the process of condemnation, and the county acquired an easement only, which carried with it no riparian rights. Whatever filling in between the road and the water the commissioners may have done, for the protection of the road from washing, accrued to the owner of the fee, and the riparian rights of the owner existing at the time the road was condemned continued in the owner unimpaired. Recognizing the force of the decisions in *Thomas v. Ford,* 63 Md. 346, and *O'Brecht v. State,* 145 Md. 176, 125 A. 539, appellees say, they make no contention that a right of way to the water over appellant's land has been acquired by prescription. It is equally certain that no right to a landing can be acquired by long-continued use. See last-cited cases.

In our opinion, appellees failed to show any reasonable doubt as to the validity of appellant's title, or "one sufficient to cause the chancellor to hesitate whether the purchaser should be obliged to complete the contract of sale." *Levy v. Iroquois Building Co.,* 80 Md. 300, 30 A. 707, 708.

Our conclusion is that appellant is entitled to a decree requiring appellees to pay the balance of purchase money less a

proportionate abatement for the shortage in the property described in the contract, with interest from April 13th, 1929. A fair abatement, we think, would be $910, or about one-eleventh of the purchase money, which is about the relation the average width (32 feet) of the strip cut off by the bridge bears to the 376.2 feet line along the forty feet road, as described in the contract.

> *Decree reversed, and cause remanded, in order that a decree may be passed in accordance with this opinion, with costs to appellant.*