## WALTER E. KRIEL *v.* WILLIAM T. CULLISON.

[No. 3, October Term, 1933.]

*Decided November 22nd, 1933.*

The cause was argued before Bond, C. J., Pattison, Urner, Adkins, Offutt, Digges, and Sloan, JJ.

*Richard E. Preece* and *Leon H. A. Pierson,* for the appellant.

*James E. Boylan, Jr.,* for the appellee.

Offutt, J., delivered the opinion of the Court.

William T. Cullison, the appellee, on March 16th, 1928, agreed with Walter E. Kriel, the appellant, to sell to him five separate parcels of land lying in Carroll County, Maryland, for $12,500, and on the same day delivered to Kriel a written receipt for fifty dollars, paid on account of the purchase price. But after that payment had been made it was found that Cullison had only a life interest in one of the tracts, and for that reason it was impossible for him to perform his contract. Both Kriel and Cullison, at that time, appear to have been desirous of completing the purchase of

the land which Cullison had undertaken to sell to Kriel, and to make that possible a proceeding was instituted for the sale of the parcel in which Cullison held the life estate, as a result of which trustees were appointed to sell it, and they reported a sale of it to Kriel for $5,000. The sale was ratified, the purchase price paid, and the property conveyed to Kriel. That parcel lay on the west side of the Hanover Turnpike Road, and was estimated to contain eighty-five acres. On December 3rd, 1930, the day on which he agreed with the trustees to purchase the eighty-five-acre tract, Kriel executed a second contract with William T. Cullison, under which Cullison bargained and sold to him the same four lots which were described in the first contract, which Cullison had made with him on March 16th, 1928, and which, with the eighty-five-acre tract, comprised all the land which Cullison in that contract undertook to sell. In that contract of December 3rd, 1930, between Cullison and Kriel, the parties agreed:

"That the said Vendor doth hereby bargain and sell unto the said Vendee, and the latter doth hereby purchase from the former, all those several tracts of land lying east of Hanover Turnpike Road, of Carroll County, State of Maryland, containing in the aggregate forty-five acres, more or less, and more particularly described as follows:

"(1) A tract of twenty acres, more or less, lying on the east side of Hanover Turnpike Road between Greenmount and Hampstead.

"(2) A tract of ten acres, more or less, lying on the Gross Mill Road.

"(3) A tract of nine acres, more or less, lying at or near Rockbrook.

"(4) A tract of five acres, more or less, lying in Greenmount.

"Being all and the same property which by the last will and testament of Jesse M. Cullison, Sr., dated May 1, 1879, and recorded in the office of the Register of Wills of Baltimore City in Wills Liber R. T. B. 61, folio 119, was devised to Jesse M. Cullison, Jr.,

for life, with remainder to his child or children, and if none surviving him, then to the said Vendor herein, the said Jesse M. Cullison, Sr., having died in 1889, and the said Jesse M. Cullison, Jr., having died in 1925 unmarried and without any child or children surviving him.

"At and for the price of Seven Thousand Five Hundred Dollars ($7,500), of which the sum of Fifty Dollars ($50.00) was paid prior to the execution of this contract of sale, the balance of Seven Thousand Four Hundred and Fifty Dollars ($7,450) to be paid upon the ratification by the Circuit Court for Carroll County, in Equity, in the case of William T. Cullison et al. v. Georgia F. Crook et al. (No. 5869), of a contract of sale of even date herewith covering Cullison property lying on the west side of the Hanover Turnpike Road.

"And * * *

"It is understood and agreed between the parties hereto that this contract of sale shall become inoperative and without effect in the event that the sale to the Vendee herein in the court proceeding aforesaid of property lying on the west side of the Hanover Turnpike Road shall not be finally ratified, and upon such failure of ratification the deposit aforesaid shall be returned."

In January, 1931, when the purchaser had the land described in that contract surveyed, it was found that the "twenty acre" tract, known as the "White Hall property," actually contained 11.52 acres, of which 1.08 acres were subject to a railroad right of way, the "five acre" tract known as the "Dayhoff" lot, 7.13 acres, the "ten acre" tract known as the "Worthington" lot, 10 acres, and the "nine acre" tract known as "Hoover's Lot," 3.748 acres. The aggregate acreage of these four lots as estimated in the contract was 44 acres, while the actual acreage shown by the survey was 31.32, a deficiency of 12.68 acres. Alleging that deficiency as a reason, the vendee refused to perform the contract, and on December 7th, 1931, the vendor filed the bill in this case

against the vendee, in which he prayed that the contract of December 3rd, 1930, for the sale of those four lots, be specifically enforced. The trial resulted in a decree in favor of the vendor, in which the court directed the vendee to forthwith pay or bring into court the purchase money less an allowance of $561.50 for the deficiency, and that failing the payment or forthcoming of said money that the land be sold and the proceeds brought into court to be distributed under its direction. The appeal is from that decree.

The important question submitted is whether, upon the facts of the case, appellee was entitled to a decree requiring appellant to specifically perform the contract of December 3rd, 1930. If he was so entitled, a subsidiary question arises, whether the abatement allowed by the decree was sufficient to adequately compensate appellant for any deficiency in the quantity of the land sold.

The material facts are either admitted by the pleadings or established by the proof, and may be thus stated:

Because of their character and location three of the four lots described in the contract may be considered as a group separately from the fourth. Those three lots are: (a) The Worthington lot on the Gross Mills Road, estimated in the contract and shown by the survey to contains 10 acres; (b) Hoover's lot near Rockbrook, estimated in the contract to contain 9 acres and shown by the survey to contain 3.748; and (c) the Dayhoff lot at Greenmount, estimated in the contract to contain 5 acres and shown by the survey to contain 7.13. These three lots were referred to in the evidence as "wood lots," were not contiguous, were remote from the turnpike, and were valued by Kriel at fifty dollars per acre.

The fourth lot, estimated in the contract to contain twenty acres, and known as the White Hall property, binds for about 904.66 feet on the east side of the Hanover Turnpike Road, which continues a short distance beyond as the main street of the Town of Hampstead. That lot was shown by the survey to contain 10.44 acres, exclusive of a railway right of way containing 1.08 acres, which runs through the property several hundred feet distant from and nearly par-

allel to the turnpike. It is separated by the turnpike from the tract estimated in the contract of March 16th, 1928, to contain 85 acres but which was found by actual survey to contain 87.79 acres. It is obvious from the evidence that the controlling consideration which induced Kriel to execute the contract of December 3rd, 1930, with Cullison was his desire to obtain that lot, which will hereafter be referred to as the White Hall property, that he attached little importance to the three wood lots, and that they were included in the contract only because Cullison desired to sell all of his property lying in Carroll County as a whole. Kriel, at the time he made the contract, had never inspected the three wood lots, did not even know where the Dayhoff and Hoover lots were located, and while he knew the "direction" of the Worthington lot on the Gross Mills Road, he did not know the "exact" location of it.

In the course of his examination Kriel admitted that, in the proceeding for the sale of the eighty-five acre tract, he had valued the frontage of that land on the Hanover Turnpike, and of the White Hall property which binds on the same road opposite to it, at $8 a foot, and that he had valued the timber on the eighty-five acre tract at $1,000. And he valued so much of the eighty-five acre tract as did not bind on that road at about $30 per acre. But accepting his valuation of the frontage of the eighty-five acre tract on the Hanover Turnpike Road at $8 per foot, which was based upon its utility for building lots, it is apparent that the remainder of that tract was worth little more than $20 an acre.

As stated above, the chancellor decreed that the vendee specifically perform the contract, but abated $561.50 from the purchase price. That abatement was based upon an allowance of $50 per acre for the deficiency in acreage, less an allowance of .033 for variation to gratify the words "more or less" in the contract. That allowance was based upon the excess acreage in the purchase of the eighty-five acre tract, which the parties had accepted without question, as a substantial compliance with the contract to convey eighty-five acres.

Turning to the first question stated, the important inquiry is whether Cullison sold the four lots by the acre or in gross. A sale in gross, sometimes .called a "contract of hazard," is where specific designated parcels of land are sold as a whole and there is no warranty, express or implied, as to quantity. 2 *Words and Phrases,* Third Series, page 446. In determining whether a sale is by the acre or in gross, as in other contracts, the intention of the parties is controlling and must be given effect. 27 *R. C. L.* 436; 39 *Cyc.* 1313, note 5.

Where the language of the contract is clear, plain, and free from ambiguity, that intention must be gathered from its four corners; but where it leaves the question in doubt, extrinsic evidence as to the surrounding circumstances and the situation of the parties is admissible to aid in its interpretation. *Ibid.*

The mere fact that the acreage is specified in the contract does not conclude the question, and where it is apparent that the specification of quantity was not intended by the parties to be of the essence of the contract, but merely descriptive of the property, the sale will be considered as in gross, notwithstanding the specification (39 *Cyc.* 1313, note), especially where the specification is qualified by the words "more or less." *Tyson v. Hardesty,* 29 Md. 305; *Slothower v. Gordon,* 23 Md. 9; *Hall v. Mayhew,* 15 Md. 551; *Stull v. Hurtt,* 9 Gill. 446; *Hurt v. Stull,* 3 Md. Ch. 24.

In *Slothower v. Gordon, supra,* in referring to the effect of those words when used to modify a specification of quantity in a contract for the sale of land, the court said: "The terms used in describing the quantity of land, have acquired a legal meaning in this State, which is supposed to be known to all purchasers. The construction of these terms is judicially determined by the cases cited by Judge Krebs, in his elaborate opinion in the case of *Hall v. Mayhew,* 15 Md. 559, afterwards affirmed by this court. The learned judge says: 'It is not necessary to look beyond the decisions of our own courts for the true import and effect of the terms "more or less" or "estimated to contain," in contracts for the sale of lands.' In *Jones v. Plater,* 2 Gill, 128, the court

adopts the law as stated in the words of Judge Story, in the case of *Stebbins v. Eddy,* 4 Mason, 419 [Fed. Cas. No. 13,342]. 'It seems to me that there is much good sense in holding that the words more or less, or other equivalent words in contracts or conveyances of this sort, should be construed to qualify the representation of the quantity in such a manner that, if made in good faith, neither party will be entitled to relief on account of a deficiency or surplus.'

"In *Hurt v. Stull,* 3 Md. Ch. 26, the Chancellor says: 'If the representation of the quantity be mere matter of description, and not of the essence of the contract, as where there are qualifying words, as "more or less," or "by estimation," the vendee must be understood as assuming upon himself the risk of the quantity.' He also quotes the language of Judge Story, as above cited, and says: 'It must be regarded as establishing the law here.' This decision was affirmed in [*Stull v. Hurtt*] 9 Gill, 451, where the court says: 'These words must be considered as qualifying the representation of quantity, and neither party could claim relief on account of a deficiency or a surplus.' " See, also, *Eastland v. Robinson,* 233 Ky. 403, 25 S. W. (2nd) 1028; *Wagner v. Goodrich,* 148 Md. 323, 129 A. 364; *Musselman v. Moxley,* 152 Md. 17, 136 A. 48; *Cohen v. Numsen,* 104 Md. 681, 65 A. 432; *Neavill v. Lightner,* 155 Md. 372, 142 A. 109. In *Marbury v. Stonestreet,* 1 Md. 147, relied upon by appellant as opposed to that principle, the affirmation of quantity was positive and unqualified, and the limitation of the rule stated in that case is pointed out in *Balto. Permanent Bldg. & Loan Soc. v. Smith,* 54 Md. 187, where it is said: "The general rule, as stated in *Marbury v. Stonestreet,* 1 Md. 147, is, where land is sold and the number of acres is stated, that quantity is of the essence of the contract, or forms a material consideration with the purchaser, whether the sale be for a gross sum or by the acre, unless there is something in the terms of the contract to show the contrary. Where the sale is for a gross sum, and there are qualifying words used such as 'more or less,' or equivalent expressions, they have been held to import that quantity does not enter

into the essence of the contract. *Stebbins v. Eddy*, 4 Mason, 419 [Fed. Cas. No. 13,342]; *Jones v. Plater*, 2 Gill, 128; *Stull v. Hurtt*, 9 Gill, 446; *Hall v. Mayhew*, 15 Md. 551; *Slothower v. Gordon*, 23 Md. 9; *Tyson v. Hardesty*, 29 Md. 305." Many of the cases cited relate, it is true, to the construction of instruments actually conveying land and not to contracts to convey, but there is no reason why the same language should have any different meaning in one case than in the other, since the deed merely consummates the contract. In *Kent v. Carcaud*, 17 Md. 291, a petition by a purchaser for an abatement from the purchase price of land which he contracted to buy from trustees appointed to sell it, the contract provided for the sale of one-half of a farm without specifying the acreage, but the trustees reported the sale as by the acre, and it was conceded that they assumed that the farm contained a greater acreage than it actually did, and that the purchaser agreed to "take it for that quantity." But the court said: "If we look to the written agreement alone, there is clearly no ground for any deduction. According to its meaning, the appellees agreed to pay a sum certain, in gross, for one-half a farm, by name, without mention of the quantity, or reference to a plat, or any stipulation on the part of the vendors. The thing bargained for was a particular farm for so much money."

*Pomeroy*, in his work on *Specific Performance*, par. 352, says: "Where the sale is by metes and bounds, or in any other analogous manner by which the particular subject-matter is identified, and the purchaser received the very parcel which he intended to buy, and there has been no misleading conduct on the vendor's part, a deficiency in the supposed amount will not prevent an enforcement of the contract, unless it should be so very great as to destroy or defeat the whole object of the purchase, and render the agreement a virtual nullity." But later in the same paragraph he adds: "It may, perhaps, entitle the purchaser to some abatement from the price, but this only in exceptional cases, where there was a clear mistake." But in *Joliffe v. Baker*, 11 Q. B. Div. 273 (an action for misrepresentation) it was said:

"*  *  * We find the land described as two parcels, each defined in the most particular manner by metes and bounds and other details, and each 'as containing, by estimation, one and a-half acres or thereabouts.'

"It turned out when the lands came to be measured that the two parcels together amounted to only 2*a*. 1*r*. 12*p*. And the question is, does this amount to a breach of warranty as to quantity? It will be noted that the conveyance does not say 'Containing by admeasurement so and so,' but 'containing by estimation so and so, or thereabouts.' I am not aware that any exact definition has been judicially given to these words, although there have been several cases illustrating their meaning—for example, it has been held that a discrepancy of five acres out of forty-one was not so serious as to amount to a breach: *Winch v. Winchester,* 1 V. & B. 375; on the other hand, a difference of 100 acres out of 349 was considered too serious to be covered by the qualifying expression: *Portman v. Mill,* 2 Russ. 570.

"I am not able to extract any principle from these cases, but I would venture to say that the real question is whether the parcels had or had not in truth and in fact been estimated to contain the quantity stated or thereabouts? If the discrepancy were very small there would be very little difficulty in believing that it might have been so estimated; if the error were very great the statement might be rejected as incredible; but still I would venture to say that in each case it is a question of fact whether the quantity had been so estimated or not, and by this I mean of course a real genuine estimate, and not a merely illusory one."

The case of *Winch v. Winchester,* 1 V. & B. 375, there cited, was a suit for specific performance. Few American cases are cited in support of the text in *Pomeroy,* and the decisions in this state at least are to the contrary. *Jones v. Plater,* 2 Gill, 125, *Brantly's Edition* and cases cited in note (b). But they do establish the principle that the words "more or less," when used to qualify a representation of quantity in a contract to convey land, will be construed, whether found in an executed or an executory contract, as indicating

an intention on the part of the parties to the contract to assume the risk of quantity, which, until rebutted by evidence of a different intent inherent in the instrument or extrinsic to it, will be recognized and enforced. Nor will a statement of the quantity of land contained in a contract for the sale of it, where the statement is qualified by the words "more or less," prevent it from being construed as a sale in gross, where it appears that the estimation was merely descriptive and that the parties intended the sale to be in gross.

Applying those principles to the facts of this case, in our opinion it is clear that in the contract of December 3rd, 1930, Cullison undertook to sell, and Kriel undertook to purchase, four different lots of land as four definite, complete, and specific parcels of ground, and that each of them intended to assume the risk of any excess or deficiency in the acreage. The price of the four lots was in gross, and the difference not only in the character and value of the several lots from each other, but the difference in value of different parts of one of the lots, was such that it was quite impossible to fix an average price per acre for them. The three wood lots were regarded by Kriel as of so little importance that when he bought them he did not know where they were located. And in respect to them he said: "Q. Familiar with these wood lots? A. No, sir, I didn't know where they were until they were surveyed. Q. Did you know where they were at the time you entered into first arrangement of contract of 1928? A. The house and twenty acres, I know where that was and I knew the Cross Mill property back there, the location, but I didn't know what it consisted of, and the Dayhoff property, I had no idea where that was; I thought it was out on road somewhere. * * * Q. You didn't put much value on those three parcels, did you? A. Well, at that time they were not valuable. Q. You say you didn't know anything about it, you were buying jack in poke, weren't you? A. Pretty much. Q. What value did you put on them when you bought them? A. Well, there was an offer of fifty dollars an acre, I understand was made to Mr. Cullison by Mr. Klinefelter, fifty dollars an acre, which would make five hundred dollars."

The lot in which he was interested, and which was the moving cause of the contract, was the White Hall property, which in the contract was said to contain "twenty acres, more or less," and he was interested not so much in the acreage of that lot as in its frontage on the Hanover Turnpike Road. That lot is divided into two parts by the Western Maryland Railroad. The front part binds on the Hanover Turnpike Road, and is valuable because of its availability for use as building sites. The back part of it is separated from the front by the railroad right of way, and apparently its only access to the highway is over a sixteen and a half foot right of way, and it is useful only for agricultural purposes. The front part binds on the Hanover Road for 904.66 feet, and Kriel in his testimony valued it not by the acre, but at $8 per front foot, or $7,237.28. There was no valuation of that entire lot by the acre, and it is obvious from Kriel's testimony that he valued it not in terms of acreage but of frontage.

He testified: "Q. Describe the property on the east side. A. On the east side there is a little over 900 feet front which are all building lots. Q. What else? A. It consists of a lot on the other side of the railroad of several acres joining Mrs. Stansbury's place, that is tillable. The wood lots do not have much value. Q. Are you willing to purchase the property on the one side without the property on the other? A. No, sir. Q. What was the total purchase price? A. $12,500. Q. Do you think you can state to the court what, in your opinion, is the value of the two parcels on the east and west side? A. I would value the property on the west side not over $5,000. On the east side I estimate it about $8 a foot. I doubt very much whether the property is as high today as when I contracted. It has been over two years. * * * Q. You were familiar with the frontage of what has been called the twenty acre piece, you knew its extent one way and its extent the other way before the survey was made? A. Yes, but I was under the impression that it contained 1139 feet. Q. Do you know, as a matter of fact, how many feet it actually does abut on the road? A. About 900 and

some feet. * * * (Court) : Q. You stated you thought there were 1139 feet on the east side, when did you have that idea? A. Your Honor; before Mr. Cullison had called me up on a number of occasions and come to see me about that property, and he said, 'I am going to sell it and if you want it come to see it.' I had Irvin Allgire run it off and he gave it to me, this is the way I was misinformed, he said 'there is 200 feet from Shipley's to Georgia, and 739 feet to the Stansbury Lane, I mean, 939, and I put the two together and made it 1100. Q. You thought there were 1139 feet when you bought it? A. Yes, sir, but after the survey was made I got straightened out, he meant 200 feet to the house and the whole lot was 937."

He has lived in the neighborhood of the property for eleven years, he knew its boundaries before the contract, and he had had its frontage measured. When asked to value it, it did not occur to him to value it by the acre, but he valued it by the foot. He knew when he signed the contract just what land he was buying, and he bought it not because it contained so many acres, but because it had a frontage of over 900 feet on the Hanover Road. So that, when his testimony is considered in connection with the use of the words "more or less" in the contract, and with the further fact that all of the lots were identified as "all and the same" property devised by the will of Jesse M. Cullison, Sr., the statement of quantity contained in the contract must be construed as descriptive and not as constituting a warranty.

And since the White Hall property and the three "wood lots" were definitely identified as the four lots mentioned in the contract, and since the contract was fair, mutual in its terms, and sufficiently certain, the plaintiff was entitled to have it specifically performed.

Assuming that the plaintiff was entitled to that relief, the only other question open for consideration is whether the abatement allowed from the purchase price by the chancellor was adequate. There can be no possible question as to the allowance for the three wood lots, because it was based upon the valuation given by the appellant himself. And while there is

no basis for valuing the White Hall property by the acre, nevertheless, under the *cy pres* rule followed in *Reigart v. Fisher,* 149 Md. 347, 131 A. 568, we can find no error in the allowance for the deficiency in acreage in that lot which could injure the appellant. Obviously the shortage was not in the front part of the lot, because appellant had measured that and knew exactly what he was buying. It is equally clear that, if he was entitled to any abatement at all for any deficiency in the acreage of the back part of it, he was only entitled to what that part was worth for its highest utility. There was no estimate of its value per acre, but similar land on the opposite side of the road was valued by the appellant of thirty dollars an acre, so that he has no just ground of complaint because he was allowed fifty dollars per acre for it.

The decree appealed from will therefore be affirmed.

*Decree affirmed, with costs.*