CHRISTOPHER P. THOMPSON *et al. vs.* JOHN J. SULLIVAN *et al.*

JANUARY 30, 1959.

PRESENT: Roberts, Paolino and Powers, JJ.

POWERS, J. This bill in equity was brought by several taxpayers of the city of Newport against the mayor and members of the city council and the Newport Yacht Club, Inc. to declare null and void a lease executed between the city and said yacht club. Prior to the hearing the attorney general was added as a party complainant to represent the general public. The cause was heard before a justice of the superior court on bill, answer and proof and resulted in the entry of a decree denying and dismissing the bill. The cause is before us on the complainants' appeal from such decree.

The testimony and documentary evidence disclose that on June 27, 1956 the city council adopted a resolution authorizing the city solicitor "to draw an agreement for allowing use of the end of the City Wharf to the Newport Yacht

Club for a period of 15 years in accordance with plans presented to the Council by the Waterfront Commission, this area having been found to be of no other public use to the city." The resolution as originally offered did not include the words "no other public use to the city," but before adoption was amended to include the provision. On April 3, 1957, after almost ten months of conferences and negotiations between the city council and the officers and members of the Newport Yacht Club, Inc., a resolution was adopted by the city council authorizing the mayor on behalf of the city to execute a lease with the yacht club, and on the following day, April 4, respondent John J. Sullivan, as mayor, executed the lease.

The pertinent provisions thereof leased to the Newport Yacht Club, Inc. for a term of fifteen years, with a right in the lessee to renew for an additional fifteen years, the southeast corner of the city yard, running northerly, westerly, southerly and easterly 105 feet in each direction together with the right to control 215 feet of the easterly face of the city yard, beginning at the southeast corner and running in a northerly direction. The consideration required the lessee to pay annually 10 per cent of its gross receipts, but not less than $300 nor more than $1,000. Furthermore the lessee was to build finger piers which were to become the property of the city at the expiration of the lease and also maintain the 215 feet of seawall under its control. The assistant city clerk John F. Fitzgerald testified that the lease was attached to the original resolution as required by the city charter and that both were on file in the office of the city clerk.

It appears that the city yard is on the easterly half of what was known as Gravelly Point and that said Point was originally the property of the proprietors of Long Wharf. On December 19, 1757 they laid out the tract into 28 lots, each being 80 feet running east to west and 40 feet running north to south, with a 30-foot right of way running south-

erly along the easterly line, westerly along the southerly line, and northerly along the westerly line, with a 30-foot way running southerly through the center, such ways to be held in common. The property is bounded on the north by Long Wharf and it does not appear from the record that the then Gravelly Point was vacant land in 1757 or prior thereto.

Councilman James S. O'Brien testified that he voted in opposition to the resolution because there was information from the department of public works that as long as the city yard was on the city pier there was further use for it. He also testified that there were many informal meetings between the members of the city council and the Newport Yacht Club, Inc. relative to the lease of the city property.

The complainants introduced as exhibits seven certified copies of the deeds whereby the city of Newport finally obtained title to the easterly half of Gravelly Point by purchase in June 1875. The city thus acquired fourteen of the twenty-eight lots bounded on the east by the 30-foot way, on the south by the 30-foot way, and on the west by the 30-foot way running through the center of Gravelly Point as laid out by the proprietors of Long Wharf in their agreement of December 19, 1757. The Newport harbor line runs southerly along the easterly face of the city yard or dock and westerly along the southerly line. It should be noted that the lease provided for the construction of the finger piers on the easterly face of the city dock only after consent had been obtained from the state.

The complainants Christopher P. Thompson and Norman Brownell testified that Newport fishermen had tied up to the easterly face of the city dock for years. The knowledge of Thompson extended over twenty-six years while operating a tavern in the vicinity of the city yard, and Brownell's personal experience as a fisherman encompassed half a century. Both testified that the easterly way had always been open and used by everyone.

George E. Lewis testified that he had been in the business of fishing for fifty-three years; that during that time he had always tied up to the easterly face of the city dock as had many fishing boats; and that the Providence to Block Island boat had once docked there. He likewise testified that the easterly way had always been used by the public as a highway.

The complainants introduced as a witness James T. O'Connell, who testified that he had been familiar with the city yard and the premises in question for about sixty-five years. He also testified that for as long as he could remember fishing boats had tied up to the city dock, as well as the Providence-Block Island boat which he understood had paid a lease rental. Mr. O'Connell further stated that whenever the city had use for the east face of the city dock, fishermen were required to pull their boats away from there, but he did not know of any fishermen ever paying wharfage fees, although several city administrations had unsuccessfully attempted to collect them. He further observed that for as long as he could remember the easterly way had been used by "fishermen and boat men." He also testified that in the early days the way in question would be obstructed by gravel, paving blocks and building materials delivered to the city yard by barges.

E. Frank Cutter, who had a real estate office in Newport and was familiar with property values, testified that in his opinion the rental value of that portion of the city yard which was leased to the Newport Yacht Club, Inc., including control of the east face of the city dock, was $2,000 annually, or for the 105-foot square tract of land as such $1,500 annually. Specifically questioned by the court as to whether or not he meant that the right to control 215 feet on the east face of the city dock, which would include the right to charge wharfage fees, was worth an annual rental of $500, Mr. Cutter replied in the affirmative.

The complainants' reasons of appeal have been grouped under five issues framed by them and will be so considered. These issues are as follows:

"(1) Is the lease valid." The complainants contend that the resolution instructing the city solicitor to draw a lease between the city of Newport and the Newport Yacht Club, Inc. was defective in that it did not specify exactly the property to be leased; that it was amended so as to change its character or purpose in violation of the city charter; and that the finding by the council that the property was of no further use to the city could not be supported in the light of the evidence that the city department of public works had advised the council otherwise.

The evidence shows that the members of the council and the city solicitor held many conferences relative to the leasing of this property and it cannot be argued that they were unaware of exactly what was to be leased. It is true that the record does not disclose the plans of the waterfront commission, but the reference thereto in the resolution clearly shows that the council had included them in their conferences. We cannot agree that the resolution is defective in that it is too indefinite.

It is further contended that in amending the resolution by adding the language indicating that the city had no further use for the property, the resolution lost its original purpose. Section 2-20 of the Rules of the Council of the City of Newport provides in part: "No ordinance or resolution shall be so amended in its passage as to change its original purpose." The complainants insist that the resolution as originally introduced did nothing more than to instruct the city solicitor to draw a lease, but that as amended it became a resolution declaring the area to be leased as of no further public use. The transcript shows that this amendment was offered after the city solicitor in open meeting advised the council that the resolution would be ineffective for the purpose sought to be achieved unless such a declaration were

made a part thereof. It is our opinion that the amendment, rather than destroying the original purpose of the resolution, was advisable if not essential to express clearly its import.

The complainants further contend that the authority of the city council to enter into the lease with the Newport Yacht Club, Inc. is derived from the provision of general laws 1956, §45-2-5, which reads as follows:

"In addition to the powers heretofore granted by charter or the public laws of the state with respect to the purchase and sale of land, the city council of any city and the town council of any town, if it shall see fit so to do, is hereby authorized, from time to time, to sell, lease, convey or use for any other public or municipal purpose or purposes, or for any purpose whatsoever, any lands or properties owned by said city, which have been purchased, acquired, used or dedicated in any manner for municipal or other public purposes, whenever, in the opinion of said city council or town council, said lands or properties have become unsuitable or have ceased to be used for such purposes."

Counsel for complainants contends that the statute does not permit the council to act unless it is shown definitely that a certain piece of city property has become unsuitable or has ceased to be used for city purposes. This court was called upon to consider the extent of a city council's authority when acting, pursuant to §45-2-5, in *Ravenelle* v. *City of Woonsocket,* 73 R. I. 270. It was therein determined that in the disposition by sale, lease or otherwise of city properties "which have been purchased, acquired, used or dedicated in any manner for municipal or other public purposes," the city council is vested with broad powers and in the absence of other statutory or ordaining restrictions the judgment of the members of the city council on the question of further use for municipal purposes is controlling. And at page 276 the court stated: "Furthermore, we are not required to pass upon the wisdom, reasonableness, or propriety of its conduct in relation to the rights of the citi-

zens and taxpayers of that city, as it is not within our province to determine matters of municipal policy." Nor are we pursuaded otherwise in the instant cause.

With respect to complainants' argument that there was no consideration for the lease, by reason of its inadequacy, we are likewise guided by our decision in the *Ravenelle* case. In the case at bar the trial justice stated in his decision that he was not impressed with the testimony of the expert as to the actual rental value but found that there was legal consideration. We cannot say that he was clearly wrong. The complainants stress the minimum payment of $300 and ignore the potential maximum. Neither do they make any reference to the acquisition of the finger piers by the city at the termination of the lease. If, in the opinion of the city council, the transaction viewed in its entirety was beneficial to the city it is enough. We will not substitute our judgment for that of the municipal officers whose prerogative in the premises is unquestioned.

"(2) Did the council have authority to grant to the Yacht Club control of 215 feet of the east face of the city wharf." Narrowly considered this issue is concerned with the status of a city dock or wharf as property within the meaning of §45-2-5. No Rhode Island case has been called to our attention, nor have we found any which deals specifically therewith. The trial justice considered this question and resolved it in favor of the action taken by the city council on the basis of the decision in *Mayor and City Council of Baltimore* v. *Baltimore Steam Packet Co.*, 164 Md. 284, where it was held that the city could grant exclusive use of the city dock for a term of years under a statute similar to ours. There is no evidence, oral or documentary, from which it can be determined that there was any wharf or dock on the easterly or southerly sides of Gravelly Point at the time the property was acquired by the city in 1875. If such were the fact or if it were not constructed until after

314

the city purchased the easterly half of Gravelly Point, we have no doubt that the rights of the city to the dock are property within the meaning of G. L. 1956, §45-2-5, and the control of 215 feet thereof by the lessor was properly the subject of a leasehold interest unless otherwise prohibited.

"(3) Did the proprietors of Long Wharf when they platted Gravelly Point, dedicate the highways bordering on tidal waters for the use of the public, and the wharf for public use." The leased premises do not include exclusive use of any of the ways laid out by the proprietors of Long Wharf. Whether these ways were ever dedicated to a public use by them or subsequently dedicated by the city, or through long use by the public an easement was created, is not in issue. Assuming that in laying out the ways said proprietors dedicated them to a public use, they did not lose the right to wharf out thereafter, nor did they lose their rights to the wharf if it was already in existence when they laid out the ways. *Clark* v. *Peckham,* 10 R. I. 35; *Providence Steam-Engine Co.* v. *Providence and Stonington Steamship Co.,* 12 R. I. 348.

There is nothing in the record from which it can be determined that the proprietors of Long Wharf before or after the allotment of Gravelly Point in 1757, either jointly or severally, ever took steps to construct a wharf or dock. Assuming that they did, it is not likely that they did so with the intention of dedicating it to a public use and thus deny to themselves and their heirs the full fruits of their efforts.

The trial justice commented on the cost of such construction, and coupling this with the importance of transportation by water in colonial days he concluded that the proprietors would not have subjected these valuable rights to pre-emption by the public. We are of the opinion that in the absence of evidence to the contrary the conclusion reached by the trial justice is not unreasonable.

"(4) Has the City of Newport any control over the east

and south face of the city wharf, which constitute the harbor line of the city of Newport." If the city in its corporate capacity owns the dock, in the same manner as the dock might be owned by an individual or private corporation, then of course the control thereof may be leased to another as fully as though the lease were negotiated between private parties, unless the property, when acquired by the city, was already dedicated to a common use in the public, or after its acquisition by the city the public acquired rights by prescription. The right to control up to the harbor line, which would include the right to tie up to the face of the dock, has long been settled in this state. *Engs* v. *Peckham,* 11 R. I. 210. Control out from the harbor line is vested in the state but, as previously noted, the provisions in the lease, whereby the yacht club is authorized to build finger piers extending out from the easterly face of the dock and thus beyond the harbor line, are specifically contingent upon the yacht club receiving permission from the state.

The dominant questions then are whether or not the property known as the city yard, constituting the easterly half of Gravelly Point, was already dedicated to the inhabitants in common forever at the time it was purchased by the city of Newport or, in the alternative, if not so dedicated did the public acquire a right by prescription through uninterrupted use by them for more than fifty years?

The first of these questions depends upon the intention of the proprietors of Long Wharf at their meeting in 1757 when they laid out Gravelly Point together with the easterly, southerly and westerly ways, and the way through the center. We have already concluded that the wharfage rights had not been dedicated.

The contention, namely, that if the dock had not already been dedicated at the time of the purchase by the city nevertheless the public has acquired rights to the dock by prescription, is based on the testimony of complainants' wit-

nesses. The trial justice noted that there is strong authority for the proposition that wharfage rights are not the subject of prescription, and cited *Tolchester Beach Improvement Co.* v. *Boyd,* 161 Md. 269, and 1 Farnham, Waters and Water Rights, §145, pages 677, 678. He further noted that there is no Rhode Island case on this point, but concluded that even if the law in this state were contrary to the doctrine laid down in the *Tolchester* case, complainants could not prevail in the instant case by reason of their failure to meet the burden of proof.

He found that the testimony of James T. O'Connell regarding efforts by the city to collect wharfage fees from time to time clearly indicated that the city never had any intention of consenting to a general public use of the dock. We cannot say that he was clearly wrong. There was testimony that whenever the use by the public was in conflict with the needs of the city, individuals whose vessels were tied to the dock were required to give way and did so. Such conduct, it seems to us, clearly suggests that the fishermen used the docks by permission and not as a matter of right.

The complainants' fifth issue is the following categorical statement: "(5) The rule in Cascambas v. City of Newport, 45 RI 343 determines the case in favor of complainants." That case was a bill in equity to declare null and void and set aside a lease executed between the city of Newport and the Newport Beach Association, a private corporation. The complainants in the instant cause argue that it is stare decisis of their contention that the proprietors of Long Wharf held Gravelly Point in trust for the public at the time they laid it out and divided it among themselves. They rely on the following language at page 347: "At a meeting of the freemen in 1714 it was voted that all vacant pieces of land in the town should be laid out as a perpetual common. We are of the opinion that in 1714 the freemen represented the original proprietors of Newport, that a meeting of the freemen could declare and put

into effect the agreement of the proprietors made in 1641, and that thereafter all lands not laid out and allotted became common lands dedicated to public use."

The record in the *Cascambas* case does not appear in the opinion, but from whatever source the court found that such action had been taken by the freemen in 1714 the opinion does not help complainants. There is nothing in the record of the instant case to show that Gravelly Point was then vacant land. However likely it may seem that the Point was in fact vacant land in 1714, no evidence that such was the case was offered by complainants and speculation is no substitute for evidence.

The complainants likewise contend that Gravelly Point was at one time known as Sandy Point, and that by the Colonial Act of 1707, the vote of the freemen of the town of Newport in 1739, and the decision of this court in *Armour & Co.* v. *City of Newport,* 43 R. I. 211, it was the obligation of the proprietors of Sandy Point to allow a general public use of its shores for wharfing. There is nothing in the record before us from which it can be determined that Sandy Point and Gravelly Point are one and the same. Furthermore the Colonial Act of 1707, on which complainants rely, specifically preserves existing property rights. If Sandy Point were in fact Gravelly Point there is nothing here to indicate the status of the Point at that time.

The complainants' appeal is denied and dismissed, the decree appealed from is affirmed, and the cause is remanded to the superior court for further proceedings.

*John C. Burke, J. Joseph Nugent, Attorney General,* for complainants.

*John F. Phelan,* City Solicitor, for respondent City of Newport.

*Sheffield & Harvey, Richard B. Sheffield, Paul J. Del Nero,* for respondent Newport Yacht Club, Inc.