## CHARLES K. ABRAHAMS *vs.* REBECCA L. KING.

*Specific Performance—Contract Alleged Not to Contain All the Terms Agreed Upon—When Payment and Conveyance to Be Made if No Time Is Fixed by Contract.*

The owner of certain lots of ground signed a contract by which she agreed to sell them for a designated price, but afterwards refused to execute a conveyance because the contract did not contain a provision requiring the purchaser to use a sewer built by the vendor and to pay a certain additional sum for the privilege. Upon a bill for specific performance, the evidence examined, and *held* to show that no such stipulation

was made by the vendor during the negotiations for the sale; that it was not fraudulently omitted from the written contract by the purchaser, who had drafted it, and that consequently he is entitled to a decree for specific performance.

.When a contract of sale of land mentions no time for the payment of the purchase money and the execution of the deed, the law implies that it should be·done within a reasonable time.

In such case, the time fixed for the payment of the purchase money by the vendor must be after reasonable notice.

The tender of performance made by the purchaser in this case, *held,* to have been within a reasonable time.

*Decided June 30th, 1909.*

Appeal from the Circuit Court for Baltimore County (DUNCAN, J.).

The cause was argued before BOYD, C. J., BRISCOE, PEARCE, SCHMUCKER, BURKE and WORTHINGTON, JJ.

*Hyland P. Stewart* (with whom was *John S. Biddison* on the brief), for the appellant.

*Wm. E. Hoffman* (with whom was *John I. Yellott* on the brief), for the appellee.

PEARCE, J., delivered the opinion of the Court.

This appeal is taken from a decree of the Circuit Court of Baltimore County refusing a decree for the specific performance of a written agreement for the sale of certain lots of land. This agreement is as follows:

"Rebecca L. King,
Contract of Sale
to
Charles K. Abrahams.

BALTIMORE, March 25th, '07.

Received of Charles K. Abrahams the sum of one hundred dollars on a/c of the purchase of all that portion of property

lying North of Elderslie avenue running back to an alley, and lying between Pimlico avenue and Green Spring avenue, in Baltimore Co., Md., to include property as it now stands, with house, store and trees (excepting one lot known as Lot No. 95, situate on the S. W. corner of Greenspring avenue and Elderslie avenue), and further described and known as Lots Nos. 84, 85, 86, 87, 88, 89, 90, 91, 92, 93, 94, 96, and 97—13 Lots, for the sum of eleven thousand seven hundred dollars.

REBECCA L. KING."

At the foot of this paper, was the following memorandum:

"Received for record April 11, 1907, at 2 P. M. Same day recorded in Liber W. P. C., No. 311, folio 539, one of the Land Records of Baltimore County, and examined.

Per   WILLIAM P. COLE, Clerk."

It appears from the evidence that Mrs. King is the owner of a large amount of real estate in Baltimore County, including the lots in question; that a considerable part of this property has been laid out into lots and plotted, a copy of said plot, showing the location and dimensions of the lots in question and the streets, avenues and alleys bounding on the same being offered in evidence and admitted; and that Mrs. King caused a number of sign boards to be put on this property, notifying the public that it was for sale, and directing inquirers to apply to Mrs. King, or Mr. Wm. E. Hoffman her attorney, giving the address of each.

In February 1907, the plaintiff, Mr. Abrahams, wrote Mrs. King asking if she desired to sell Lot 96, adjoining Lot 95, then owned by him. She replied by letter Feby. 21st, 1907, that she did not care to name "the lowest cash price" unless he decided to take the lot, and that as soon as she could dispose of sufficient lots on the north side of Elderslie avenue to justify her in building a house elsewhere for her gardener, the farm house occupied by him would be removed. She also said she was going South the next day to be absent two weeks, and that he could see her on her return, adding: "My phone is Maryland, 461 Garrison; you can

ring me up to make sure I would be at home when you call."
On March 18th, 1907, she wrote and mailed to plaintiff a
postal card informing him of her return home, and that he
could see her in regard to the lot at any time he could call,
or he could see Mr. Hoffman at the Fidelity Building. A
few days thereafter he did call upon her at her residence in
reference to the Lot No. 96, but there was then no reference
to the purchase of *other* lots. A few days later he again
called at her residence, and at that interview the agreement
herein transcribed was entered into and executed by her.
The plaintiff's testimony is that Mrs. King furnished the
paper upon which, and the pen and ink with which, the
agreement was written, and that she exhibited to him a plat
from which the description of the lots was taken; he also says
that he thinks he read her the paper, and that she also read
it over to herself. Concurrently with the execution of this
paper, the plaintiff gave Mrs. King a check on the Citizens'
Nat. Bank for $100, the amount mentioned in the agree-
ment as then received, and this check states on its face, that
it is on acct. of purchase price for Lots 84, 85, 86, 87, 88,
89, 90, 91, 92, 93, 94, 96 and 97 Elderslie.

Mrs. King testified that when the agreement was made,
plaintiff asked her if she wanted a mortgage or cash sale, and
she said she was selling for cash; that he asked her if she had
a check in the house, and she first said no, but then said she
believed she had, and "she went up and brought down a
check on the old Fidelity which he wrote on and gave her."
This check was put in evidence by plaintiff and it shows that
the words "Fidelity and Deposit Company," were crossed
out and the words, "Citizens' Nat. Bank of Baltimore," were
written above them, and the check was filled in for $100, to
the order of Mrs. King, and was signed by the plaintiff, and
delivered to Mrs. King, and the uncontradicted evidence is
that the plaintiff has ever since had the money in that bank
to meet it. The next morning about 9.30 o'clock, plaintiff
sent his clerk, Miss Parsons, with another certified check for
$100 to be substituted for the first check, and formal dupli-

cate contracts of sale to be signed by Mrs. King, one to be retained by her, and one to be returned to him, but she refused to accept or sign any papers until she saw her lawyer, and these papers were returned by Miss Parsons to Mr. Abrahams. Later in the same day Mrs. King and Abrahams met at Mr. Hoffman's office, and Abrahams produced the duplicate contracts and requested Mrs. King to sign them. Mrs. King testified that she left the matter with Mr. Hoffman, and he told her not to sign it unless it contained a stipulation to use her sewerage plant, and that if she signed it without that provision, he would not put the matter through for her, and that she thereupon refused to sign it. Mr. Hoffman testified substantially to this effect, stating that he knew Mrs. King was building an expensive sewer from which she expected to get $150 for each lot she sold, and that this agreement contained no provision to that effect, and he charged Abrahams with endeavoring to take advantage of Mrs. King by negotiating with her instead of with him as her attorney. Abrahams denied any knowledge of any such condition of sale, or any mention of such condition. Mrs. King testified that she told Abrahams that "the value of these lots was increased by the sewage system she had built, with which they *could* be connected when built on," but neither in her sworn answer, nor in her testimony, does she pretend to say that there was any mention of a charge therefor as a condition of the sale. She had sold lots on the south side of Elderslie avenue for a less price than that agreed upon with Abrahams, and she says she argued with him that in view of the building of her sewage plant, and the improvements on the south side of the avenue, the lots on the north side were worth more than those on the south side. Another objection made by Mr. Hoffman was that the contract contained no provision for retaining the gardener's house for his use until Mrs. King could provide another, but Abrahams acknowledged that Mrs. King mentioned that, *after the agreement was signed,* and he agreed to allow a reasonable time for that purpose.

The only substantial question is as to a stipulation in the contract *requiring* Abrahams to connect with her sewer, and to pay for each connection $150, and a further yearly charge of $10. If Abrahams fraudulently omitted that stipulation from the contract he is not entitled to the relief he now seeks. If Mrs. King, relying upon herself, chose to enter into the contract in this case, without inserting such a provision into the contract or without plainly stating to Abrahams, that such a stipulation was a part of the agreement and must be inserted in the deed, so as to fix upon him such a charge of bad faith as would justify the Court in refusing specific performance, and leaving him to an action at law for damages, then she must abide the consequences of her agreement, unless there is some defect in the contract as it stands, which will warrant refusal of the decree sought.

There is nothing in the contract itself which prevents such decree. It is in writing, is certain, fair in all its parts, for an adequate consideration, and capable of being performed. Taken in connection with the plat furnished by Mrs. King, the property can be accurately described in a conveyance, and in such case "it is as much a matter of course for a Court of Equity to decree specific performance, as it is for a Court of law to give damages for its breach." *Popplein* v. *Foley,* 61 Md. 385; *O'Keefe* v. *Irvington,* 87 Md. 200.

The only question that could be raised is that the contract fixes no time for the conveyance and payment, and it was held in *Lawson* v. *Mullinix,* 104 Md., that the law implies that payment and conveyance is to be made in a reasonable time. A careful examination of the testimony has not enabled us to discover any evidence of fraud or bad faith on the part of Abrahams in obtaining this contract, and it must be remembered that while specific performance is not a matter of right, and is in the discretion of the Court, yet where it is resisted on the ground of fraud in obtaining the contract, such fraud is not to be lightly assumed, but must be established as in other cases by satisfactory proof. Mrs. King's own testimony, if nothing else in the case were con-

sidered, fails to establish the charge of fraud. Mr. Abrahams says he read her the agreement before she signed it. She says she never read it, or heard it read, and she *supposed* it was a mere memorandum of the numbers of the lots, though she nowhere says that Abrahams misrepresented its character or contents. She says she did not receive the check as a check, and never looked at it or read it at all, and supposed it was a receipt, though she does not attempt to explain how it could be a receipt, and admits that when she brought him the check to fill and sign she asked him if he had the money to meet it in the "Old Fidelity." When she returned this check on March 29th, after refusing to carry out the transaction, she did not then, nor at any time until her answer was filed, allege any of the matters she now alleges charging fraud. She simply refused to perform the contract, apparently, from the record, because her counsel thought she had been unfairly dealt with, and he refused to represent her in the matter. She testifies that she used the fact that she had established a sewerage system, and the *opportunity* to connect with it as the lots were built on, as an argument with Abrahams to prove the increased value of the lots. But this is inconsistent with the present claim, that she thereby intended him to understand, and that he did understand that the contract *obliged* him to connect with her sewer, and to pay in addition to the contract price, a bonus of $150 for each of the thirteen lots, $1,950, and a yearly tax of $10 per lot besides. The existence of the sewerage plant, coupled with such an obligation would decrease, instead of increasing the value of the lots, by depriving the owner of the adoption of such system of sewerage as might prove to his advantage. Unless Abrahams understood when the contract was signed that he was bound to use this sewer on the terms stated, and he fraudulently omitted that provision from the contract, Mrs. King cannot be permitted to avoid it. She had previously sold to a Mr. Walzl a number of lots just across Elderslie avenue under certain conditions embodied in his deed, among which was one *permitting, but not requiring,*

him to connect with her sewer upon certain terms to be agreed upon. Abrahams knew these conditions were intended to apply to all the lots, and all those conditions were inserted in the deed which she refused to execute. We do not think it necessary to review the testimony in further detail. It is clear that Mrs. King is an intelligent business woman with considerable business experience. She invited personal communication in reference to the sale of these lots, generally by the signs displayed on the property, and specially in Mr. Abrahams case by letter and postal card, and as to that transaction took the matter into her own hands. Our conclusion upon the whole case is that Mrs. King was desirous of selling these lots, and when she dealt with Abrahams, was willing to take the chances of his coming to terms with her for the use of the sewer when he should be ready to build upon the lots, but that after conference with her counsel she changed her mind and desired to recede from the contract.

What was said by JUDGE BOYD in *Smith* v. *Humpreys,* 104 Md. 290, seems particularly applicable here. "Any person who comes into a Court of equity admitting that he can read, and showing that he has average intelligence, but asking the aid of the Court because he did not read a paper involved in the controversy, and was thereby, imposed on, should be required to establish a very clear case before receiving the assistance of the Court in getting rid of such document. It is getting to be too common to have parties ask Courts to do what they could have done themselves, if they had exercised ordinary prudence, or to state it in another way to ask Courts to undo what they have done by reason of their own negligence or carelessness." The burden of proof, where fraud is charged in obtaining a contract fair upon its face, is upon the party charging such fraud, and therefore, what was said above is properly applicable in this case, although Mrs. King is not complainant in the case. She alleges fraud, and asks the Court to aid her on that account in getting rid of a contract, valid, unless fraudulently obtained.

It was also contended that plaintiff was guilty of laches in

asserting his right to sue, but this contention cannot be sustained. From March 25th, to June 15th, he was persistent, both in person and by letter, in demanding performance of the contract. Then he employed Mr. Stewart to take up the matter, and negotiations between Mr. Stewart and Mr. Hoffman were continued until October 31st, 1907, when Mrs. King abandoned the controversy, and consented to execute the deed without any stipulation requiring the use of her sewer or relating to the gardener's house, and naming the next day at noon for closing the transaction. Mr. Stewart immediately protested against the short notice given, less than twenty-four hours, the naming of an hour when a previous engagement would prevent his presence as Abrahams attorney, and urged without avail the doubt of his being able to communicate with Abrahams in time. He was not able, after exhausting every effort, to reach Abrahams, and at noon next day Mrs. King refused to wait a moment and declared the whole matter off. This conduct is not suggestive of sincerity, but rather of a purpose to prevent Abrahams' tender of the purchase money, by affixing impossible conditions as to time. The tender was made however a few days later, on the 11th of November, at Mr. Hoffman's office, but was refused. Under the circumstances of this case the tender was in reasonable time. No tender was required previous to Oct. 31st, because Mrs. King had expressly declared she would not accept the money or execute the deed. In the view which we have taken of the case, it is unnecessary to consider the exceptions to the testimony.

Abrahams promptly consented during the taking of the testimony to correct the error of including the alley on the north of these lots in the deed, and it must be eliminated in any deed hereafter presented her for execution.

For the reasons given the decree must be reversed.

> *Decree reversed and cause remanded that a decree may be passed in conformity with this opinion, costs above and below to be paid by the appellee.*