## BERNSTEIN ET AL. v. REAL ESTATE COMMISSION OF MARYLAND ET AL.

(Two Appeals in One Record)
[No. 76, September Term, 1959.]

222

*Decided December 18, 1959.*

*Motion for rehearing and for stay of mandate filed January*

224

*12, 1960, rehearing denied January 20, 1960, and issuance of mandate stayed until the Supreme Court of the United States determines whether the appellants are entitled to a writ of certiorari, provided their petition therefor is filed within thirty days from January 20, 1960.*

The cause was argued before BRUNE, C. J., and HENDERSON, HAMMOND, PRESCOTT and HORNEY, JJ.

*J. Calvin Carney* and *Walter C. Mylander, Jr.,* for the appellants.

*Joseph S. Kaufman, Assistant Attorney General,* with whom was *C. Ferdinand Sybert, Attorney General,* on the brief, for the Real Estate Commission of Maryland, one of the appellees.

*Melvin J. Sykes,* with whom were *Herbert J. Arnold* and *David Kimmelman* on the brief, for Allen Kleiman et al., the other appellees.

HORNEY, J., delivered the opinion of the Court.

This is the first appeal governed by the Administrative Procedure Act to reach this Court since its enactment by Chapter 94 of the Acts of 1957 [now codified as amended as Code (1957), Art. 41, Sections 244-256, inclusive].

On this appeal we are asked to review the orders of the Baltimore City Court affirming the findings and conclusions of the Real Estate Commission of Maryland (commission) that there was sufficient competent, material and substantial evidence to justify suspending the licenses of a broker and his associate.

The appellants are Manuel M. Bernstein (Bernstein) and Warren S. Shaw (Shaw), trading as Manning-Shaw Realty Company (realty company or Manning-Shaw), often herein referred to collectively as "the brokers." They are cast on this appeal in two different "acts" of unethical misconduct, combined in one record. The first (in a four-pointed complaint) charged them with violations of Code (1957), Art. 56, Section 224(b), (j), (s) and (a), which prohibits [b] "a continued and flagrant course of misrepresentation," * * * [j] "misleading or untruthful advertising," * * * [s] "bad faith, incompetency or untrustworthiness, or dishonest, fraudulent, or improper dealings" by real estate dealers and salesmen or agents and (as applied here to Bernstein only) [a] the obtaining of licenses by "false or fraudulent representation." The commission concluded there had been violations of all of the charges except the last, as to which it declined to take any action at the time of the hearing. The complainants cross-appealed the refusal of the commission to act on the last point, but when the lower court sustained the action of the commission they did not appeal to this Court. The second charge (in a separate complaint) concerned a violation of § 224(o) [of Art. 56], which forbids the acceptance of "a listing contract to sell property unless such contract provides for a definite termination date without notice from either party." The commission also found there had been a violation of this charge. At the conclusion of the hearing, the commission ordered a three months suspension of the licenses of the brokers in each case, to run concurrently.

The first complaint concerned the affixing of a "sold" sticker to a "for sale" sign placed on the property in Baltimore City known as 3800 Grantley Road and leaving it there for approximately three months. The gist of the complaint was that there had not been a bona fide sale of the property

and that the sticker on the sign was a deliberate misrepresentation to induce property owners in the neighborhood to sell their homes and by immediate solicitation to induce them to use Manning-Shaw as brokers. The realty company countered by claiming that it held a contract of sale signed by Joseph Carter and wife (Carter or the purchaser), which had been executed before the sticker had been affixed to the sign, and that settlement had been delayed because the purchaser had had difficulty in disposing of several other properties then owned by him.

The second complaint, as hereinbefore indicated, concerned the use of an illegal listing contract. The brokers, in denying that the contract contravened the statute, claimed that even if the statute had been violated it was not a wilful transgression.

In their petitions for judicial review by the lower court, the brokers contended, among other things, that the complaints constituted an unlawful conspiracy against the civil rights of themselves and their customers in that, in substance, they were charged with "block-busting" and that the complaints were intended to prevent Negroes from purchasing and occupying homes of their own selection in violation of constitutional guarantees.

The first complaint, although denying any prejudice on the part of the complainants, did contain allegations that Manning-Shaw had specialized in sales of residential properties to Negroes in formerly all-white neighborhoods, that such practices were intended to promote panic and instability in the vicinity for the purpose of exploiting and capitalizing on such prejudices as did exist in order to obtain as many listings as possible and that such practices had adversely affected the morale of the residents and depreciated property values.

Whatever may have been the real motive of the complainants, the commission early in the proceeding before it, made it clear, and continued to reiterate, that the hearing was for the sole purpose of determining whether or not Bernstein and Shaw had violated the law in connection with the exercise of their rights under the licenses issued to them, and that the

commission was not concerned with "block-busting." Furthermore, we think the lower court was correct in refusing to receive into evidence, even as "explanatory background," the proffered exhibits with regard to publicity given the accusation. At the conclusion of the hearing on appeal below, the lower court found no basis in the record to believe the commission was either biased or arbitrary in the manner in which it had conducted the proceeding before it. The question is not specifically before us on the appeal to this Court, and we shall not consider it further.

Since there are two separate and distinct cases we shall summarize the salient parts of the oral testimony and documentary evidence and the findings of fact in each before discussing the questions presented.

## The 3800 Grantley Road Case

On June 19, 1958, Carter and his wife entered into a contract to purchase this property from the Eutaw Realty Corporation, the capital stock of which was owned equally by Bernstein and Shaw, who, as herein stated, are partners in Manning-Shaw, the brokers in the transaction. It is this contract that is the main topic of this litigation. The property was sold for $18,000 subject to an annual ground rent of $120. According to the terms of the contract $500 had been paid prior to its execution, $550 was payable within two days and $1950 on or before the expiration of thirty days. The balance of $15,000 was to be financed by a standard land installment contract with weekly payments of $37.50.

Carter was making only $54.62 a week but claimed his income was $70. His wife, who had an undetermined number of children, was employed as a domestic. At the time the contract was signed, the purchaser had small equities in several other properties. Through Manning-Shaw, also acting as brokers, he had previously placed a $500 deposit on another house under a contract still in effect when the Grantley Road contract was made. Shaw claimed it was understood that the prior contract had been canceled, but there was testimony that Carter and his family claimed it as their "home" for some time after June 19. Manning-Shaw pro-

duced mortgage loan applications to show that loans had been applied for and rejected shortly after the contract for 3800 Grantley Road had been executed. · The $500 allegedly paid prior to the signing of this contract was a credit transaction on the books of Manning-Shaw for that amount held in escrow by them as a deposit on the previously executed contract for the other property. Carter, however, paid $550 on June 21, 1958, and $850 on September 13, 1958. These transactions were verified by ledger entries in the bank account of Manning-Shaw.

The complainants, who resided across the street from and next door to 3800 Grantley Road, testified that after the "sold" sticker had been affixed to the sign nothing seemed to be done with respect to the property and that it appeared to be unoccupied. On one occasion another neighbor saw Carter doing some work around the house and upon advising him that the electricity should be turned on to provide current for the sump pump, he replied that "he would see the boss." Carter also stated, according to the neighbor, that he did not know who had bought the house. A woman police sergeant testified that when she had gone to the property on January 31, 1959, and on subsequent visits, she found Carter's wife and eight children occupying the kitchenette where a gas stove afforded the only heat in the house. Hunger and lack of clothing were also noted. But a photograph, introduced by Manning-Shaw, showed Carter sitting with an agent of the brokers in a well furnished living room in the house.

There was also evidence that the sales agent who had made the sale had not, as late as the end of 1958, received a commission on the sale although both he and the realty company admitted a commission was due him. Manning-Shaw claimed they paid the salesman through a drawing account and in round figures, not in specific commissions. But their records indicated that previously he had been paid exact commissions by them for the specific properties which he had sold.

Another witness, posing as a buyer after placement of the "sold" sticker, had been informed by another sales agent of Manning-Shaw that the property was not sold at that time. Manning-Shaw claimed the agent had said the sale might not

go through and that the prospective "buyer" could have it if the pending sale was not consummated.

On this evidence the commission made five findings of fact to the effect: (i) that the sales agent had not received a commission for making the sale; (ii) that another agent had offered to sell the property to a prospective buyer two months after the purported sale had been made; (iii) that the purchaser was still under contract to purchase another property through the same brokers when he purportedly purchased 3800 Grantley Road; (iv) that there were several unexplained discrepancies between the purported contract of June 19 and the transaction allegedly consummated on September 19, in which the required down payment was made less and the weekly payments were made smaller; and (v) that there had not been a normal occupancy of the property by the purchaser. The commission further found that it was difficult to give credence to the explanations of Bernstein and Shaw; that the testimony of Shaw, who was most familiar with the transaction, was vague and indefinite; and that the testimony of Carter was contradictory and inconsistent and entitled to little weight. Therefore, the commission, having concluded that the alleged sale was not bona fide, found the brokers had violated § 224(b) of Art. 56 [continued and flagrant course of misrepresentation], (j) [misleading and untruthful advertising] and (s) [bad faith and improper dealing].

Section 255(g) of Article 41, *supra,* provides:

> "The court may affirm the decision of the agency or remand the case for further proceedings; or it may reverse or modify the decision if the substantial rights of the petitioners may have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:
>
> (1) In violation of constitutional provisions; or
> (2) In excess of the statutory authority or jurisdiction of the agency; or
> (3) Made upon unlawful procedure; or
> (4) Affected by other error of law; or
> (5) Unsupported by competent, material, and sub-

stantial evidence in view of the entire record as submitted; or

(6) Against the weight of competent, material and substantial evidence in view of the entire record, as submitted by the agency and including de novo evidence taken in open court; or

(7) Unsupported by the entire record, as submitted by the agency and including de novo evidence taken in open court; or

(8) Arbitrary or capricious."

While it appears that the scope of judicial review by a trial court of the findings, inferences, conclusions and decisions of administrative agencies under the statute has been broadened to some extent, it is clear that the statute did not intend that the court should substitute its judgment for the *expertise* [1] of those persons who constitute the administrative agency from which the appeal is taken. Cf. *Maryland Racing Commission v. McGee,* 212 Md. 69, 80, 128 A. 2d 419, 425 (1957). See also *Marino v. City of Baltimore,* 215 Md. 206, 222, 137 A. 2d 198, 205 (1957).

Generally, when the entire record shows that the findings of fact and conclusions of law are supported by competent, material and substantial evidence taken before the agency and such *de novo* evidence, if any, as may be taken by the court, and such findings and conclusions are not against the weight of such evidence, it is the function of the court to affirm the order of the agency or remand the case for further proceedings if that be necessary. On the other hand, if the court should find that the substantial rights of a petitioner for review have been prejudiced, by one or more of the causes specified in § 255(g)(1)-(8) [of Art. 41], because of an administrative finding, inference, conclusion or decision, then it is the function of the court to reverse or modify the order.

In this case [3800 Grantley Road], the brokers contend that the exercise by the commission of its statutory functions

---

1. The statute [Sec. 252(d)] specifically provides that agencies "may utilize their experience, technical competence and specialized knowledge" in evaluating the evidence.

was against the weight of the evidence in that they claim the affirmative evidence of good faith—shown by the execution of the original contract and the final consummation of the substituted transaction made three months later, the payments on account of the purchase price and the declined applications for mortgage loans—could not be overcome by the showing of "negative" evidence of bad faith, or the inferences deducible therefrom. They further contend that the weight of such evidence did not support the conclusions of law reached by the commission.

Ordinarily it is true, of course, that when the bona fides of a *formal* contract is attacked for the purpose of having it canceled or modified, the burden to show that it was not made in good faith is upon those who attack it. *Abrahams v. King,* 111 Md. 104, 111, 73 Atl. 694, 696 (1909). It is also true, as it is in court proceedings, that the burden of proof is generally on the party asserting the affirmative of an issue before an administrative body. 42 Am. Jur., *Public Administrative Law,* § 131. Thus, in this case, there is no doubt that the complaining property owners had the burden throughout of proving the alleged violations of the prohibitory provisions of the real estate "code." 2 Davis, *Administrative Law,* § 14.14 (1958). But we are of the opinion that the complainants sufficiently met that burden.

In a case such as this, where it was the bona fides of the acts of the real estate brokers which was under attack—not for the purpose of canceling or modifying the contract but for the purpose of showing the brokers had misrepresented the transaction by claiming the contract was valid when in fact it was not—there was no reason why the commission in the exercise of their skill and judgment, as they were specifically empowered to do by § 252(d) [of Art. 41], should not also consider, together with the positive evidence, the so-called negative evidence—that the sales agent had not been paid his commissions; that the purchaser with limited means was still bound at the time under a previous contract to purchase another property; that the discrepancies between the original contract and the substituted transaction were not explained; and that there had not been a normal occupancy

of the premises—and the inferences deducible from such negative evidence. There was also no reason why the commission could not consider the circumstances of the parties, their credibility as witnesses, the dealings between them prior to the execution of the contract of sale and their subsequent acts and declarations, in deciding whether or not the brokers had violated one or more of the prohibitory provisions charged in the complaint. Moreover, there was also the positive testimony of a neighbor to the effect that the purported purchaser, after the date of the purchase, had denied buying the property and, on the same occasion, had referred to the brokers, or one of them, as his "boss," as well as the positive testimony of the prospective "buyer" to the effect that another sales agent had shown him the property as being for sale when it had purportedly been sold, which evidence, though disputed, the commission may well have believed. Furthermore, under the facts and circumstances in this case, the commission was not obliged to accept the explanations of Bernstein, or of his associate, with respect to the bona fides of the transaction.

The statute specifically provides that an administrative agency "may admit and give probative effect to evidence which possesses probative value commonly accepted by reasonable and prudent men in the conduct of their affairs." Section 252(a) [of Art. 41]. There was no contention that the evidence in question did not meet this test. With respect to the weight of the evidence, it is true, of course, that a mere surmise or conjecture that it was sufficient would not be enough. The comparative degree of proof by which a case must be established is the same in an administrative as in a civil judicial proceeding, *i.e.*, a preponderance of the evidence is necessary, but proof beyond a reasonable doubt is not required. 42 Am. Jur., *Public Administrative Law*, Section 132.

On the record from the commission in this case, the trial court found that the findings and conclusions of the commission on the evidence before it were not arrived at in contravention of the standards stated in paragraphs (5), (6) or (7) of Section 255(g), *supra*, and that such evidence sup-

ported the decisions of the commission. We think the record sustains the trial court. The order of the lower court in the 3800 Grantley Road case will therefore be affirmed.

The brokers also complained that the lower court erred in not receiving the proffered documentary proof that a commission had been paid for making the sale. Such additional evidence is not receivable unless the court is satisfied that it is material and that there were good reasons for failure to present it in the proceeding before the agency. Section 255(e) [of Art. 41]. But, even if we assume, without deciding, that it should have been received as *de novo* evidence, it would not have destroyed, even if it had been believed by the court, the effect of the other findings of fact on which the commission also based its conclusions of law.

### The Listing Contract Case

This case involves a more concise factual background. The complainant, an incorporated improvement association, charged that Manning-Shaw had used an illegal listing contract in violation of Section 224(o) [of Art. 56], *supra*. The offending clause in the contract read:

> "The owner reserves the right to withdraw the property from said agent at any time after six months. But it is understood that this [a]greement is not revokable while any negotiations are pending for sale or exchange of the property. And if the property is sold or exchanged subsequently to any party with whom said agent has been negotiating, the commission will be paid to said agent."

In their answer to this charge, the brokers claimed that even if the contract was not proper—in that it did not provide for a definite termination date "without notice from either party" as the statute requires—the violation was not wilful. In refutation of that claim the former secretary of the commission testified that Bernstein had been to his office sometime during the year 1956, primarily on another matter, and that, while he (the secretary) could not recall having seen a Manning-Shaw listing contract without an expiration

date, that he was certain that he had warned them that all listing contracts must have a termination date since it was his policy to tell everyone who asked him about the matter that a definite expiration date must be included in order to comply with the law. Bernstein admitted that his firm knew that the law had been recently changed to require a termination date.

The commission found that the brokers had knowledge that their listing contract did not comply with one of the provisions of Section 224(o) [of Art. 56].

When the appeal from the commission in this case reached the court below, the brokers applied for leave to present additional material evidence. The court ordered that such evidence be taken in open court. It was to the effect that Shaw had sent the commission samples of their listing contracts and other forms in a letter dated January 19, 1957, in connection with a complaint dealing with a different matter, the inference being, we assume, that the commission had not then or thereafter objected to the legality of their listing contract.

In this case [Listing Contract], the brokers now contend that their listing contract was a good one and that the statute does not require the use of words "termination" or "terminate" if that part of the contract binding on the seller is in fact terminated by the language used, which they insist their contract did. They further contend that the order of the commission suspending their licenses for this technical violation was arbitrary and capricious since the violation had harmed no one.

The short answer to these contentions is that the statute specifically requires that a listing agreement *must* contain "a definite termination date *without notice from either party*" [emphasis added] and that since there was a clear-cut violation of the statute, the suspension of the licenses, under the existing facts and circumstances, was not either arbitrary or capricious.

The trial court found that there was competent, material and substantial evidence in the entire record as submitted including the *de novo* evidence taken in open court—not overcome by countervailing evidence—to support the commission's finding of fact and conclusion of law to the effect that

the brokers had violated one of the provisions of Section 224(o) [of Art. 56]. We agree. Since the order of the lower court in the Listing Contract Case was proper, it will also be affirmed.

*Orders affirmed in both cases,*
*the appellants to pay the costs.*