542 A.2d 847

**Marshall K. STEELE, III, and Stephen E. Faust**

v.

**John G. GOETTEE, Personal Representative of the Estate of Elvira B. Chaney.**

No. 130, Sept. Term, 1987.

Court of Appeals of Maryland.

June 27, 1988.

James P. Nolan (Donna G. McCabe, and Council, Baradel, Kosmerl & Nolan, P.A., Annapolis), on brief, for appellant.

Ronald H. Jarashow (William A. Franch and Franch & Jarashow, P.A., Annapolis), on brief, for appellee.

Argued before MURPHY, C.J., and COLE, RODOWSKY, McAULIFFE, ADKINS, BLACKWELL, JJ., and MARVIN H. SMITH, Associate Judge of the Court of Appeals of Maryland (retired), Specially Assigned.

MARVIN H. SMITH, Judge, Specially Assigned.

This case concerns an in gross contract for the sale of real estate and the determination of a trial court in a declaratory judgment action brought by the buyer that the seller should specifically perform the contract. We shall reverse the judgment of the Court of Special Appeals contained in *Goettee v. Steele*, 71 Md.App. 520, 526 A.2d 626 (1987), and thus shall affirm the decree of the trial court that the seller specifically perform the contract.

Aside from the issue of whether this was a sale in gross, the facts are undisputed. Those which we shall relate are gleaned from the findings of fact of the trial court or are uncontroverted facts taken from the record. Under Maryland Rule 886 when an action has been tried by the lower court without a jury, this Court will review the case upon both the law and the evidence, "but the judgment of the lower court will not be set aside on the evidence unless clearly erroneous and due regard will be given to the opportunity of the lower court to judge the credibility of the witnesses." There is no contention that the trial judge erred in finding that this was an in gross contract.

Elvira B. Chaney died on February 6, 1985. John G. Goettee qualified as the personal representative under her will on March 8, 1985. She owned a home in Annapolis at Giddings and Forbes Avenues where she had lived for a number of years. Goettee is both an accountant and a lawyer. He has been practicing law since about 1964 and began representing Mrs. Chaney in accounting matters back in the 1950's.

Goettee testified that once he had qualified as personal representative he obtained plats and a tax map of Mrs. Chaney's property. The tax map showed approximate di-

mensions of 100 feet across the front for the two lots owned by Mrs. Chaney and approximately 150 feet down the sides. From a realtor he obtained a plat prepared by a surveyor in 1952 that showed an area of approximately 17,500 square feet.

Goettee procured an appraisal of subject property under date of March 25, 1985. It estimated the fair market value at $261,000.

Goettee requested of an Annapolis surveyor a feasibility study of the property in question. He advised Goettee on April 16, 1985:

"The configuration of property shown was obtained from deed found in Liber WMB 22/282 with plat recorded at WMB 22/269. There appears, however, to be a boundary problem and/or deed discrepancy that can only be resolved by a field survey. City records indicate a 'gap' in boundaries and deed plotting likewise reflect a possible gap. Field investigation indicates possession possibly different from title lines."

On April 24, 1985, the realtor with whom Goettee ultimately listed the property requested a survey. In a contract dated May 14, 1985, Goettee listed this property with that realtor stating the area was approximately 15,650 square feet. The asking price was $395,000. The petitioners here were excluded as potential buyers from that listing as was Rev. Lance, an adjoining landowner.

Petitioners Marshall K. Steele, III, and Stephen E. Faust are physicians who practice in partnership. They own a building directly across the street from the Chaney property. They proposed erection of a building on the Chaney property, if they could purchase it, of about 14,000 square feet, the size of the building occupied by them. Faust paced off the Chaney property down two sides and concluded that the lot contained approximately 21,000 square feet, a conclusion he did not communicate to his attorney. Using information which he said he procured from the realtor to whom we have previously referred, this attorney prepared

for Steele and Faust a contract with Goettee for the sale of the subject property. In that contract the property is described as:

"16,000 square feet, more or less, together with improvements thereon located at 716 Giddings Avenue, Forbes Street, Annapolis Maryland, as further described in the Land Records of Anne Arundel County, at Liber, folio."

The contract called for a sale price of $279,500 with a down payment of $10,000. This contract was submitted to Goettee on May 10, 1985. On May 28 Goettee returned the contract and check, stating, "[a]s explained, we expect to receive more than $18.00 per square foot for this property and have listed it with a real estate broker for $395,000. We may not receive a contract for this amount, but we thought we would wait a reasonable time to see what surfaces."

In late June Dr. Faust called Goettee by telephone, learned that no other offers had been made, expressed his and Dr. Steele's interest in purchasing the property, and asked what price Goettee really wanted. Goettee said $300,000. Dr. Faust testified:

"I was using a phone with a long extension cord and I walked into an examining room with a window looking out on this piece of property and I said, now look, Mr. Goettee, I want to be completely clear about this. What we are talking about is this corner property with the fence around it that I am looking out of my window at, right now. Is that right?

"And then he said, yes, that's right.

"And I said, what you are selling and what we are buying is the area inside this fence, is that right?

"And he said, yes.

"And I said, well, I am going to put something in the contract to that effect and initial it and we'll send it over with a change in the purchase to three hundred thousand dollars.

"And he said, fine."

Goettee confirmed this conversation.

The contract was resubmitted with the purchase price changed to $300,000 and a provision added at the end:

"This contract is additionally contingent upon the completion of a survey showing that the actual boundaries of the property are within two (2) feet of the fence surrounding the tract."

A contract of sale was signed by all parties on July 3, 1985.

Goettee's deposition was read into evidence. He was questioned about the contingency:

"Q  Now let me ask you a question, what did you understand that last contingency to mean?  That is the contingency on the last page of the contract?

"A  It only meant to me that he was endeavoring to buy the whole tract.

"Q  What was the tract that you were selling?

"A  What was surrounded by the fence.  I [sic] was my thought at that time that the contract was signed.

"Q  That was the piece that you believe was owned by Mrs. Chaney that extended from the Lance property all the way down to Forbes Street and from Giddings Avenue back to the fence behind Grauls Market?

"A  Right.

"Q  The entire corner parcel?

"A  Right."

After the contract was signed, a survey, which had been requested by the realtor on April 24, was completed.  We attach a copy of that plat to this opinion which the reporter is directed to reproduce.  That survey shows an area of 22,047 square feet.  Interestingly, however, it shows an abandoned portion of Forbes Avenue running through the dwelling.  One of the Chaney deeds called for a place of beginning at a certain distance from the intersection of Ridgely Avenue and Giddings Avenue.  The other deed called for the point of beginning to be at the intersection of Giddings Avenue and Forbes Street.

After the survey was received, according to Faust, Goettee called him. "He said, there is an additional parcel. It has got another title to it. There is more land here than we thought and we need to—you need to pay more money." However, Goettee said he did not change the listing with the realtor at $395,000 after receiving the survey.

Goettee testified that after the survey came in showing 22,000 square feet, he called the attorney for Faust and Steele and told him that he thought he should have $400,000 for the property but if the doctors would pay him $350,000 "without any qualms, one way, shape or form, [he] w[ould] settle."

Based on information supplied by the surveyor, Goettee had a deed prepared in September from the owner of the abandoned Forbes Street area, conveying the property to him as personal representative. He said he asked his real estate agent to see if he could acquire the property for $500. The husband of the owner called Goettee and said they would sell for $1,000. Goettee said he "didn't do anything for the thousand ($1,000) because I reasoned in my mind should the plaintiffs prevail in this suit, let them pay the thousand ($1,000) dollars to get the adverse possession."

On January 22, 1986, Drs. Steele and Faust filed a complaint for declaratory judgment asking that they be declared the equitable owners "of the property located at 714–716 Giddings Avenue," and that the agreement of sale dated July 3, 1985, be declared valid and enforceable against Goettee as personal representative of the estate of Mrs. Chaney. The trial judge (Wolff, J.), filed a comprehensive and well-reasoned opinion. He decreed specific performance.

The Court of Special Appeals reversed. It said that "[e]ven though [it] reverse[d], [its] review of the record indicates that there was sufficient evidence to support th[e] factual conclusion of the [trial] court" that "the sale of the property was in gross, and not by the acre." The Court of Special Appeals stated that "[o]n several occasions, th[is]

[C]ourt has allowed the abatement of price when the sale was in gross," citing *Kriel v. Cullison*, 165 Md. 402, 406, 414–15, 169 A. 203 (1933), "(upholding the trial court's abatement of $561.50 for the deficiency in a contract conveying 'forty-five acres, more or less')" and *Reigart v. Fisher*, 149 Md. 336, 348–49, 131 A. 568 (1925), "(ordering a two thousand dollar abatement for shortage in a contract conveying seven acres more or less)." [1] The intermediate appellate court said that this Court "has taken great pains in construing qualifying phrases such as 'more or less,' 'about,' or 'approximately' in a manner that will minimize the harsh effects of an in gross contract." 71 Md.App. at 524–26, 526 A.2d at 628–29. It further observed that "[e]ven when th[is] Court has refused to allow rescission or adjustment in the purchase price, it has issued the warning that qualifying phrases such as 'more or less' should not provide a universal haven or refuge against all personal liability." 71 Md.App. at 526–27, 526 A.2d at 629. The court further said:

"Although the circuit court determined that the actions of appellees as buyers did not reach the level of fraud, we find disturbing the circumstances surrounding the transaction. First, the discrepancy in quantity was not minor, but a forty percent variation. Second, from the very beginning, appellees possessed the knowledge that the actual square footage of the parcel substantially exceeded the amount recited in the contract for sale and the amount which appellant thought he was selling. Specifi-

---

**1.** In *Kriel* Judge Parke as Chief Judge of the Circuit Court for Carroll County allowed an abatement in a suit for specific performance brought by the vendor against the vendee. The vendee had refused to perform the contract because of the deficiency. *Reigart* likewise was a suit by the vendor against the vendee. The contract called for "about 7 acres, more or less, and improved by a 15 room stucco cottage, a garage and other improvements." The seller owned but 4.764 acres. This Court said, "The evidence shows that the price of the two acres lot which plaintiffs were negotiating for to take the place of the shortage was two thousand dollars, and that amount should have been allowed in abatement." 149 Md. at 348–49, 131 A. 572.

cally, appellee Dr. Faust admitted that he knew the size of the lot to be about 21,000 or 22,000 square feet. Third, appellant compiled considerable information regarding the parcel. Numerous surveys indicated that the parcel's size was in the range of 16,000 square feet as recited in the contract. Although the surveys and other data did indicate that the precise size remained in question, these documents in themselves contained nothing that would put an individual on inquiry notice that there might be a gross variance. Fourth, appellant was not the actual owner of the parcel, but was merely the personal representative of the Chaney estate, who had only visited the land and reviewed various surveys and maps.

"And finally, appellant's actions during the negotiations indicate that he considered size and the resulting per square foot cost as critical and central to reaching an agreement. Appellant rejected the first offer for $279,-000.00 since the price did not provide a minimum of $18.00 per square foot. Appellant's letter of May 28, 1985 clearly stated that if appellees offered a minimum of $18.00 per square foot for the entire 16,000 square foot tract, then he would consider selling the property to them. When appellees increased their offer to $300,-000.00, a value of $18.75 per square foot, based on 16,000 square feet, appellant accepted.

"From these facts, we think that appellant intended to enter into an in gross contract, but not to assume the risk of extreme variation in quantity. In light of the Maryland case law that has attempted over the years to mitigate the harsh effects of in gross sales, we must reverse. In such cases as this one, the circuit court should have either ordered appellees, at their option, to pay for the excess or to rescind the contract *in toto*. In reaching this decision, this court is mindful of the fact that relief to vendors who have entered into an in gross sale is rare. When the vendor happens not to be the true owner, but a fiduciary, and when the buyer possesses

prior knowledge of the sale, however, this result is warranted." 71 Md.App. at 527–29, 526 A.2d at 630.

Petitioners contend that under Maryland law one who intends to enter into an in gross contract assumes the risk of variation in quantity; that the Court of Special Appeals improperly found fraud on the part of the buyers by requiring them to disclose to the seller the size of the property being sold; that in determining the intent of the parties the Court of Special Appeals improperly considered extrinsic evidence, and that the intermediate appellate court improperly concluded that a fiduciary/vendor is held to a lesser standard of care in the sale of real property than a true owner/vendor. On the other hand, respondents contend that the Court of Special Appeals correctly found that equitable circumstances required rescinding an in gross contract for gross mistake, that mutual mistake or misrepresentation or unilateral mistake about material facts existed which justified rescission, and that no lower standard was set for a fiduciary seller.

As we indicated at the outset, under Rule 886 we "review the case upon both the law and the evidence, but the judgment of the lower court will not be set aside on the evidence unless clearly erroneous and due regard will be given to the opportunity of the lower court to judge the credibility of the witnesses." Rule 1086 to like effect is applicable to the Court of Special Appeals. If there is substantial evidence to support the trial court's factual conclusion, that finding must be reviewed in the light most favorable to the prevailing party below and the appellate court should accept that conclusion. *Dougherty v. Merc.– Safe Dep. & Tr.*, 282 Md. 617, 621–22, 387 A.2d 244, 247 (1978).

The significance of the finding by the trial court that what was involved here was a sale in gross is found by referring to the opinion of Judge Offutt for the Court in *Kriel v. Cullison*, 165 Md. 402, 408, 169 A. 203, 205–06 (1933):

"A sale in gross, sometimes called a 'contract of hazard,' is where specific designated parcels of land are sold as a whole and there is no warranty, express or implied, as to quantity. 2 *Words and Phrases*, Third Series, page 446. In determining whether a sale is by the acre or in gross, as in other contracts, the intention of the parties is controlling and must be given effect. 27 *R.C.L.* 436; 39 *Cyc.* 1313, note 5.

"Where the language of the contract is clear, plain, and free from ambiguity, that intention must be gathered from its four corners; but where it leaves the question in doubt, extrinsic evidence as to the surrounding circumstances and the situation of the parties is admissible to aid in its interpretation. *Ibid.*

"The mere fact that the acreage is specified in the contract does not conclude the question, and where it is apparent that the specification of quantity was not intended by the parties to be of the essence of the contract, but merely descriptive of the property, the sale will be considered as in gross, notwithstanding the specification (39 *Cyc.* 1313, note), especially where the specification is qualified by the words 'more or less.' *Tyson v. Hardesty,* 29 Md. 305; *Slothower v. Gordon,* 23 Md. 9; *Hall v. Mayhew,* 15 Md. 551; *Stull v. Hurtt,* 9 Gill. 446; *Hurt v. Stull,* 3 Md. Ch. 24."

*Brodsky v. Hull,* 196 Md. 509, 77 A.2d 156 (1950), involved a suit by a purchaser against a seller for return of a down payment on the ground of fraud. The land was advertised in a newspaper as containing about an acre. The buyer refused to sign the contract unless it stated that he would receive about an acre. The agent of the seller "inserted in the contract in his own handwriting the words 'one acre more or less'." 196 Md. at 512, 77 A.2d at 157. A survey revealed the actual area to be only .465 of an acre. The trial judge instructed the jury:

"If you find that the statement in the contract was not made for the purpose of deceiving the Brodskys, but was made in good faith by the Hulls, that they thought they

had an acre of land there and that they were able to convey what the Brodskys saw, when they saw the property twice before the contract was made, and that they offered to convey within the time limited by the contract, then your verdict will be for the defendants." 196 Md. at 514, 77 A.2d at 158.

The jury returned a verdict in favor of the defendant. This Court affirmed. Judge Delaplaine observed for the Court:

"It is a firmly established rule in this State that where it appears by definite boundaries, or by words of qualification, such as 'more or less,' in a contract of sale that the statement of the quantity of land is mere estimation and description, and not of the essence of the contract the buyer takes the risk of quantity, and is not entitled to an abatement of price on account of a deficiency, in the absence of fraud. *Jones v. Plater,* 2 Gill 125, 128, 41 Am.Dec. 408; *Stull v. Hurtt,* 9 Gill 446, 451; *Hall v. Mayhew,* 15 Md. 551, 568; *Slothower v. Gordon,* 23 Md. 1, 10; *Tyson v. Hardesty,* 29 Md. 305; *Jenkins v. Bolgiano,* 53 Md. 407, 420; *Baltimore Permanent Building & Land Society v. Smith,* 54 Md. 187, 203, 39 Am.Rep. 374; *Cohen v. Numsen,* 104 Md. 676, 65 A. 432; *Wagner v. Goodrich,* 148 Md. 318, 129 A. 364; *Musselman v. Moxley,* 152 Md. 13, 136 A. 48; *Neavitt v. Lightner,* 155 Md. 365, 142 A. 109; *Kriel v. Cullison,* 165 Md. 402, 409, 169 A. 203. This rule does not bar an action of deceit for fraudulent misrepresentation of quantity, or a suit in equity for rescission of contract or abatement of purchase price for innocent misrepresentation or mutual mistake. It is also true that in some cases an unreasonably large deficiency in quantity may be an indication of fraud." 196 Md. 514–15, 77 A.2d at 158.

The Court further said, "[I]t is generally true that a purchaser is entitled to assume that the seller knows the acreage of the land which he is selling." 196 Md. at 516, 77 A.2d at 159. We know of no rule that would vary this general principle in the case of a fiduciary making sale, particularly a fiduciary such as the one in the case at bar

who had visited and revisited the property in question many times over the years.

In an earlier day, before the passage of the Uniform Declaratory Judgment Act in Maryland, the action here would have been one for specific performance rather than one for a declaratory judgment. However, specific performance was what was sought by the purchasers and what was granted to them. We thus look at the law of specific performance.

In *Hupp v. George R. Rembold Bldg. Co.*, 279 Md. 597, 369 A.2d 1048 (1977), Judge Singley said for the Court:

"Generally, the granting or withholding of a decree for specific performance lies within the discretion of the trial court, *Gross v. J & L Camping & Sports*, 270 Md. 539, 543–44, 312 A.2d 270, 273 (1973), quoting from *The Glendale Corp. v. Crawford*, 207 Md. 148, 154, 114 A.2d 33, 35 (1955)):

'This discretion is not, however, arbitrary; and where the contract is, in its nature and circumstances, unobjectionable—or, as it is sometimes stated, fair, reasonable and certain in all its terms—it is as much a matter of course for a court of equity to decree specific performance of it as it is for a court of law to award damages for its breach.'

"An overview of circumstances in which specific performance may be granted can be found in this Court's opinion in *Charles County Broadcasting v. Meares*, 270 Md. 321, 324–26, 311 A.2d 27, 30–31 (1973):

'The granting of specific performance rests within the sound discretion of the trial court, *Horst v. Kraft*, 247 Md. 455, 459, 231 A.2d 674, 676 (1967); Restatement of Contracts § 359(1) (1932). If a contract is fair, reasonable and certain, specific performance may be granted almost as a matter of course, *Excel Co. v. Freeman*, 252 Md. 242, 246, 250 A.2d 103, 106 (1969). This is true even if the contract is contingent, if the contingency can be met, *Scheffres v. Columbia Realty Co.*, 244 Md. 270, 284, 223 A.2d 619, 626 (1966); within

the time stated, *Paappe v. Grimes*, 256 Md. 490, 499, 260 A.2d 644, 649 (1970). *See generally Chapman v. Thomas*, 211 Md. 102, 126 A.2d 579 (1956).' "
279 Md. at 600–01, 369 A.2d at 1050–51.

The Court said in *Beck v. Bernstein*, 198 Md. 244, 81 A.2d 608 (1951):

"Of course, specific performance of a contract will not be decreed unless it is clear, unambiguous, and certain in all its parts and is fair and mutual. [citing cases] A contract, to be final, must include all the terms which the parties intend to introduce and material terms cannot be left for future settlement." 198 Md. at 248, 81 A.2d at 609–10.

*3 Pomeroy's Equity Jurisprudence*, (5th ed. S. Symons, 1941) § 926 states:

"The doctrine, however, is now settled [in a majority of jurisdictions] that *mere* inadequacy—that is inequality in value between the subject-matter and the price—is not a ground for refusing the remedy of specific performance; in order to be a defense, the inadequacy must either be accompanied by other inequitable incidents or must be so gross as to show fraud. In short, inadequacy as a negative defense and as an affirmative ground for cancellation is governed by one and the same rule." *Id.* at 631 (bracketed material in original; italics in original).

The author correctly cites, among other cases, *Lawson v. Mullinix*, 104 Md. 156, 167–69, 64 A. 938, 942–43 (1906), for this proposition.

In *Kappelman v. Bowie*, 201 Md. 86, 93 A.2d 266 (1952), where the Court affirmed a decree dismissing a bill for specific performance of a real estate contract repudiated by the vendors on the ground of mistake and inadequacy of price, Judge Henderson said for the Court:

"We agree with the chancellor that the price in the instant case was grossly inadequate, and that the property was worth at least $9,000 in fee, the price that the appellees, according to their testimony, thought they

were selling for. Mere inadequacy of price is, of course, not a sufficient ground for denying specific performance, but it may be considered in connection with other grounds of equitable relief." 201 Md. at 91, 93 A.2d at 268.

This case comes back to the opinion of the trial court. In that opinion the judge quoted from *Jenkins v. Bolgiano,* 53 Md. 407 (1880), where Chief Judge Bartol said for the Court:

"In the absence of fraud, or false representations, inducing him to enter into the contract, the complainant is bound by the terms of his lease and deed, and cannot complain if the lot has turned out to be smaller than he supposed. He purchased the lot in gross according to its metes and bounds as described in the trustee's deed. The rule in such cases is thus stated by Chancellor Kent: 'Whenever it appears by definite boundaries, or by words of qualification, as "more or less" or as "containing by estimation," or the like, that the statement of the quantity of acres in the deed, is mere matter of description, or *not of the essence of the contract,* the buyer takes the risk of the quantity, if there be no intermixture of fraud in the case.' 4 Kent, 467." 53 Md. at 420. (emphasis added by the trial judge).

The trial judge found the purpose of Drs. Faust and Steele in purchasing the property was to build a medical office consisting of 14,000 square feet. He said:

"The plaintiffs were concerned only that they purchase a lot large enough for a 14,000 square foot office building. The price of the land was not stated in dollars per square foot. Although the Defendant arrived at his price by calculating a price per square foot, the sale was for the land within the fence."

He concluded that the statement of the quantity of square feet was not of the essence of the contract because the concern of the plaintiffs with their purpose of building a building containing 14,000 square feet "was with the size of the lot as a whole and not with a specific number of square

feet." He found no fraud on the part of the plaintiffs that would result in rescission of the contract. Relative to the contention of Goettee that Drs. Faust and Steele knew from their own calculation that the lot contained more than 16,000 square feet, he said:

"[T]he Court finds that the plaintiffs paced off the lot in order to compare it with their existing lot. By pacing off both lots, the Plaintiffs compared the areas and determined that they were of equal size. The Plaintiffs did not know the square footage of the existing lot. All they knew was that the existing lot contained an office building consisting of 14,000 square feet. Since the two lots were approximately the same size, the plaintiffs believed they could construct a 14,000 square foot office building on the Giddings Avenue lot. The plaintiffs' rough estimation of the size of the lot does not give rise to any fraud."

The trial judge "f[ound] that the intention of the parties was to sell the area within the fence at 716 Giddings Avenue" and thus rejected any contention that any inherent ambiguity in the contract might warrant, under the circumstances presented, rescission of the contract or adjustment of the purchase price. He found that "mutual mistake is not proven by clear, strong and convincing evidence." He dealt with the argument that "rescission is required because Plaintiffs made a material misrepresentation as to the actual size of the tract" by saying "this Court finds that the plaintiffs paced off the lot and made a rough estimate of the area to determine whether a 14,000 square foot building could be built. Under these circumstances, there is neither a knowing or negligent misrepresentation by the plaintiffs as to the actual size of the lot."

The trial judge took up the contention that there should be a rescission on the basis of unilateral mistake by referring to the "four conditions precedent to rescission for unilateral mistake" laid down in *Baltimore v. DeLuca–Davis Co.*, 210 Md. 518, 124 A.2d 557 (1955). There Judge Hammond said for the Court:

"The general rule as to the conditions precedent to rescission for unilateral mistakes may be summarized thus: 1, the mistake must be of such grave consequences that to enforce the contract as made or offered would be unconscionable; 2, the mistake must relate to a material feature of the contract; 3, the mistake must not have come about because of the violation of a positive legal duty or from culpable negligence; 4, the other party must be put *in statu quo* to the extent that he suffers no serious prejudice except the loss of his bargain." 210 Md. at 527, 124 A.2d at 562.

The trial judge found the conditions precedent not met. He said enforcing the contract was not unconscionable because "[t]he parties agreed to purchase a lot for a lump sum. The contract fully expresses their intention." He found no unilateral mistake where the seller relied on the buyers' statement of square footage. The trial judge found "rescission based on the Defendant's unilateral mistake is not warranted."

■ The trial judge rejected a contention that the contract failed for a lack of a meeting of the minds because he had "determined that the parties did intend to sell the tract of land at 716 Giddings Avenue for a lump sum of $300,-000." He rejected a contention that the description of the land was insufficient, rendering the contract voidable, saying, "The testimony showed that a survey was made of the lot. The surveyors had no trouble locating the tract in order to perform the survey." He did not clearly err in any of those findings. There was evidence to support him.

We discount the cases cited by respondent from other jurisdictions having to do with variance in the area conveyed because Goettee's decedent did not hold record title to all of the land being conveyed. Title to part of the land apparently rests upon adverse possession, an issue not tried below. If the petitioners do in fact determine to build upon the subject property and, as is the usual case, seek financing, then, undoubtedly, they will be faced with one of three possibilities as a prerequisite to such financing: (1) the

finding of a title company willing to insure title based upon adverse possession; (2) negotiation with and obtention of a deed from the record owners of that portion of the land not included in the deeds to Mrs. Chaney; or, (3) the bringing of a suit to establish title by adverse possession. *See, generally,* the discussion by Judge Hammond for the Court in *Clarke v. Lacy,* 213 Md. 482, 489–90, 132 A.2d 478, 482 (1957).

JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED AND CASE REMANDED TO THAT COURT FOR THE PASSAGE OF AN ORDER AFFIRMING THE JUDGMENT OF THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY; RESPONDENT TO PAY THE COSTS.

Case No. _1111764_
☒ Plaintiff's/State's Exhibit _9_
☐ Defendant's
☒ Admitted in Evidence _6-25-86_
☐ For Identification

SEE CITY TAX MAP 58
PARCELS 144 & 149